POWELL, Plaintiff in error, v. STATE, Defendant in error.
[Case No. 76–508–CR.]
HICKLES, Plaintiff in error, v. STATE, Defendant in error.
[Case No. 76–510–CR.]

Supreme Court

*Nos. 76–508–CR, 76–510–CR. Submitted on briefs November 1,
1978.—Decided November 28, 1978.*
(Also reported in 271 N.W.2d 610.)

For the plaintiffs in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, *Ronald L. Brandt,* deputy state public defender, and *Mark Lukoff,* assistant state public defender.

For the defendants in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general.

BEILFUSS, C. J.   On November 6, 1975, at about 6:15 p.m., at the Vine Street Tap in Milwaukee, the bartender, Amos Pinnex,[1] was confronted by a black man at the bar pointing a revolver in his face.   Another black man carried either a bolt action shotgun or a rifle.   Five people were in the bar when the robbers entered—the bartender, three elderly regulars, and a customer named Larry Parks who later admitted being a party to the robbery and acting as a look-out for his conspirators. Parks also shared in the proceeds of the robbery.

The armed robbers obtained the money in the cash register and the wallets of the customers.   The robbers were in the tavern approximately ten minutes.

The police were called and arrived at the scene about twenty minutes after the robbery.   Pinnex provided an initial description of the robbers at this time.   This description, contained in the police department report on the matter, was as follows:

". . . two Negro males, No. 1 being a Negro male, eighteen to twenty years, five foot eight inches, thin build, dark complexion, medium afro, thin mustache, short goatee with a chipped upper right front tooth, wearing a black coat and jacket, zipper front and dark green slacks; along with a second Negro male who was

---

[1] Amos Pinnex is also referred to as Amos Pinnix in the record.

in his twenties, six (feet) two (inches), dark complexion, wearing platform shoes, red slacks, natural hairdo and carrying possibly a .38 blue steel caliber revolver. . . ."

Five or six weeks after the robbery, on the basis of the original description and a statement by Parks admitting his involvement and implicating Girard Powell and Donald Hickles, Pinnex was asked to view an array of five photos. All the photos were black and white Bureau of Investigation photographs selected to fit the same general description; all were of black males, approximately five foot eight to six foot one, appearing to be in their early twenties or late teens. Included in the group were photos of Powell, Hickles and Parks. Pinnex was shown the photos twice. On both occasions he identified Powell and Hickles as the men who held him up, and picked out Larry Parks as the customer in the bar at the time of the robbery.

Subsequently, Powell and Hickles were arrested, tried separately, and convicted of armed robbery and being a party to a crime. The state's case in both trials rested on Pinnex' out-of-court and in-court identifications of the two defendants. The weapons and cash were never recovered. No satisfactory fingerprints were found at the scene. The three remaining witnesses, all too frightened to look at the gunmen during the robbery, were unable to corroborate Pinnex' identification and did not appear at either trial.

In the present consolidated proceeding, defendants (plaintiffs in error) contend it was reversible error for the trial court in each case to admit both Pinnex' pretrial photographic identification and his later in-court identification of the two defendants.

A criminal complaint was issued charging Donald W. Hickles, Girard Powell and Larry Parks with armed robbery, party to a crime in violation of secs. 943.32(1)(b) and (2) and 939.05, Stats., for the armed robbery which

occurred on November 6, 1975, at the Vine Street Tap in Milwaukee. The complaint noted that bartender Pinnex had depicted Hickles as carrying a handgun and Powell as wielding a rifle or shotgun. A preliminary examination which resulted in Hickles' bind over for trial was held in the county court of Milwaukee county before Reserve Judge T. J. PRUSS.[2]

At the preliminary Pinnex made an in-court identification of both Parks and Hickles and related the general circumstances of the robbery. In contrast with the information contained in the complaint, he identified Hickles as the fellow who carried the shotgun. He testified that this man had come to within five feet of him on that evening. According to his testimony—which also contradicted his statement in the criminal complaint—it was the taller gunman, not involved in the proceeding and not identified by name by Pinnex—who had the pistol. Pinnex testified further that in the initial description he gave to the police he described the robber with the shotgun as five foot five, five foot six or five foot eight, weighing about 165 pounds and wearing a hat. Neither gunman wore a mask. The tavern was "fairly light." Pinnex was able to observe the men for about ten minutes. Pinnex also revealed that the police had asked him to view a lineup, but he "left town." Hickles' attorney moved to dismiss on the ground that the identification by Pinnex was "so suggestive." The motion was denied and defendant Hickles was bound over for trial.

Prior to the commencement of the jury trial, the trial court heard the defense motion to suppress the allegedly improper eyewitness identification.

---

[2] Parks appeared as a co-defendant with Hickles at this proceeding. Although he was also bound over at the close of the preliminary, his case was severed because of Bruton problems. He did not testify in either the Powell or the Hickles actions.

At the hearing on the motion Pinnex, Patrolman David Kane and Detective Roosevelt Harrell appeared for the state. Pinnex testified that he was asked to make a photographic identification on two consecutive days approximately a week after the robbery. On the first occasion he was approached at work by two uniformed police officers. One of the officers, Patrolman Kane, asked him to "just identify the people." That was all the officer said, he did not suggest who might be in the pictures. Pinnex was able to make an identification and told the officer so. The photos Pinnex selected as being of the two gunmen (Powell and Hickles) and the supposed customer (Parks) were the top three photos in the stack. On the following day another law enforcement official, Detective Harrell, asked him to look at the same stack of five photos. Pinnex again selected only the photos of Hickles, Powell and Parks.

Patrolman Kane testified that he spoke with Pinnex on December 15, 1975. At that time he handed Pinnex the photos, in no special order, and asked him to view them and tell him if any of the persons photographed were involved in the robbery. Pinnex viewed each one for a minute or two and stated that Hickles' picture and Powell's picture "positively were two of the men involved in the robbery." Pinnex did not display any hesitancy once he reached the photos and gave no indication of vision difficulty.

Detective Harrell testified that he talked to Pinnex on December 16, 1975, also at his place of part-time employment. He handed Pinnex the same five photos, stating that he wanted him to look at them to see if he could recognize any of the people who had robbed the Vine Street Tap. Pinnex spread them out on a car and picked each one up one at a time. He then picked out the photos of Parks, Hickles and Powell, saying "[t]his is one of them" or words to that effect. On cross-examination,

when asked why a second photograph viewing was considered necessary, Harrell explained that he had been about to draft the complaint at the time and wished to verify that Mr. Pinnex could positively identify the suspects. Additionally he wished to clear up the discrepancy in regard to who had held which weapon.

At the close of the testimony defense repeated its motion to suppress, citing the inclusion of the photos of Parks and Powell, the small number of photos in the array, and the fact that Hickles was the only subject pictured with a beard. The court, finding that the pictures themselves were not improper and that no improper influence or unlawful suggestion tainted Pinnex' viewing of them, denied the motion. The case then proceeded to trial.

Pinnex, Patrolman Kane and Detective Harrell again appeared for the state. As in the pre-trial proceedings Pinnex, the first witness, again related the circumstances of the robbery. At about 6:10 p.m., a man (Larry Parks) entered the bar and persuaded Pinnex to join him in a game of pool. Shortly thereafter another man came in and asked for a package of gum. As Pinnex turned to to give him change the man, later identified as Powell, pulled out a black handgun and pointed it at Pinnex. Then another man entered with a rifle or shotgun and told Pinnex to get behind the bar. At one point Pinnex testified that he stood with his hands up while the gunman with the pistol emptied the cash register and told everyone to take his wallet out. However, later in his testimony he stated, in response to a question by defense counsel, that the one who was taking the money out of the register was "the gentleman behind you" (*i.e.*, Hickles). Pinnex identified defendant Hickles as the shorter man who carried the rifle or shotgun and who was the second to enter. Defendant's face was not covered. While the witness had never seen Hickles or Powell

before, he had the opportunity to observe them for the approximately six to ten minutes they remained in the tavern. The tavern was fairly light. It wasn't quite dark outside, and the bar was lit by two lights behind the bar and two overhead. The witness reiterated his initial description of defendant: about five foot nine inches, 165 to 170 pounds, with dark clothing, a hat and a beard. He also repeated the testimony he gave at the suppression hearing concerning the two photo identification sessions. It was brought out on cross-examination that Pinnex was asked to view a lineup but didn't want to. On redirect, the seventy-year-old bartender again testified that there was no doubt in his mind that defendant Hickles was one of the persons that committed the robbery.

Patrolman Kane was the second witness. He reiterated his testimony regarding Pinnex' viewing of the photos on December 15, 1975. The photos were shown to Pinnex at his work about five weeks after the robbery. There were five Police Bureau of Identification photos which were handed to Pinnex in a stack in no particular order. Pinnex was asked to look at the photos and see if he could pick out anyone that may have been involved. Kane further testified that Pinnex, in contrast with his later statements and his testimony at the trial, indicated that Powell held the shotgun and Hickles the rifle. However, the witness also testified that Pinnex showed no hesitancy in picking out the photos.

Detective Harrell repeated his suppression hearing testimony regarding the second photo identification which took place the following day, December 16, 1975. Like Kane, he declared that Pinnex displayed no hesitancy in selecting the photos of Hickles and Powell.

Defense called only two witnesses. Detective Charles Schulte read the initial description given by Pinnex to the police, as it was recorded in the police department report on the crime. According to the description, the

shorter gunman, identified by Pinnex as Hickles, was initially described as having a chipped upper right front tooth. Defense's second witness was Dr. Dennis W. Engel, a dentist, who had examined Hickles' teeth at defense request. He testified that none of Hickles' front teeth had been chipped, capped or repaired in any way.

At the close of the testimony defense made a motion to dismiss alleging insufficient evidence and unreliable eyewitness identification. The motion was denied.

In his closing argument defendant counsel made an intense and lengthy attack on the reliability of the bartender's identification of Hickles. The jury instructions were given. Among the instructions given were those on the identity of the defendant, the weight and credibility of the evidence, and prior inconsistent statements.

In Powell's case a preliminary examination was held before the county court of Milwaukee county: FREDERICK P. KESSLER, Judge. Amos Pinnex, the bartender, appeared. His testimony concerning the events of November 6, 1975, was essentially the same as he gave at the Hickles trial, but with minor discrepancies. Defense moved to dismiss for lack of evidence. The motion was denied and Powell was bound over for trial.

A motion to suppress in-court and/or other identification of defendant was filed. A hearing on the motion was held before Judge MANIAN immediately prior to the jury trial of the case. As in Hickles, Patrolman Kane, bartender Pinnex, and Detective Harrell were called by the state as witnesses.

Patrolman Kane testified that Pinnex was asked to look at the photographs because of Larry Parks' statement on December 15, 1975, that Powell was involved in the robbery. Five photos were assembled: three were of the suspects; the two others were chosen solely by their physical description from Kane's own file kept by him for identification purposes. Kane's only comment

to Pinnex was to ask him to view the photos and if possible pick out anyone that may have been involved. The process took about five to ten minutes. Pinnex picked out Parks and said he was a customer in the bar on the evening of the robbery. Then, Kane testified, Pinnex picked out Powell, identifying him as the man who held the shotgun, and Hickles, indicating that he had carried the revolver. Next Pinnex took the stand and again recounted the initial description he gave the police and the circumstances surrounding his first photographic identification of Powell and Hickles made to Patrolman Kane. However, on this occasion he was unable to recall whether Detective Harrell had showed him any photos the following day. Detective Harrell was the final witness on the motion. His testimony regarding Pinnex' second photo identification session which took place on December 16, 1975, was the same as the testimony he gave in Hickles, summarized above. At the close of the testimony the court found that the array was not impermissibly suggestive and that Pinnex was not improperly influenced during the identification procedure. The motion was consequently denied and the case proceeded to trial.

Pinnex' testimony on the final occasion was somewhat vague, at times confused and contradictory. Defense attempted to impeach him with prior inconsistent statements made at the preliminary and the suppression hearings. Pinnex testified that Powell told him to come out from behind the bar. On cross-examination he declared that he did not remember his testimony at the preliminary that Powell had not said a word. Again, Pinnex testified that Powell came up to the bar and stood there for five minutes before returning to stand at the door some 35 feet away—thus enabling Pinnex to observe his face for a time at close-hand. When confronted with his testimony at the preliminary in which he stated that

Powell had remained at the door throughout the robbery, Pinnex simply denied having said it. Finally, asked on cross-examination why the criminal complaint and the testimony of Patrolman Kane both quoted him as identifying Powell as the one with the shotgun, Pinnex stated, "[t]hey must have it, got crossed up, this is the one [indicating defendant Powell] that had the handgun." On redirect Pinnex reasserted that he had no doubt that Powell was one of the persons that robbed him.

The police officers' trial testimony was essentially the same as that given in prior proceedings both in this case and in Hickles'. It need not be repeated.

Powell took the stand in his defense. He denied being in the tavern on the date in question, declaring that he had gone straight from work at 3:30 or 4 p.m., to his girlfriend Denise Wilkerson's house and remained there all night. He also testified that he did have a chipped upper right front tooth at one time, but had it repaired in November of 1974.

Denise Wilkerson was the only other defense witness. She was only able to testify that Powell would *usually* come by her house after work—sometimes staying the night, sometimes leaving at 2 or 3 a.m. She explicitly stated she did not know if Powell had done it or not.

The issues are:

1. Did the trial court err in refusing to suppress both the out-of-court photograph identifications of Powell and Hickles and the subsequent in-court identification of them?

2. Should new trial be granted both defendants in the interest of justice?

Both defendants argue that the out-of-court photographic identifications of the defendants in each case should have been suppressed because, paraphrasing the language in *Simmons v. United States*, 390 U.S. 377 (1968), they were based on police procedures which were

so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification under a totality of the circumstances. As a consequence, defense further argues, the in-court identifications were also improperly admitted because the state failed to meet its burden to show that an independent basis for the in-court identifications existed. The defendants concede that the matter of an independent source for the in-court identifications does not arise if the issue of the suggestibility of the out-of-town identification is resolved in the state's favor.

The use of photographic identification procedure by law enforcement officials in the course of a criminal investigation is neither radical, nor novel, not even particularly uncommon. "Identification by photograph viewing is one of the alternative identification procedures available to police authorities." *Jones v. State,* 59 Wis.2d 184, 190, 207 N.W.2d 890 (1973) ; *Holmes v. State,* 59 Wis.2d 488, 495, 208 N.W.2d 815 (1973), and has been for some years. "Photographic identification is necessary in order to aid and effectuate criminal law enforcement." *Rozga v. State,* 58 Wis.2d 434, 440, 206 N.W.2d 606 (1973). The Supreme Court in *Simmons v. United States, supra,* 390 U.S. at 384, recognized its use and extolled its virtues as an exculpatory as well as an inculpatory device:

". . . this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs."

However, the possibilities for impermissible and improper suggestion in the context of a photographic dis-

play do exist. Some aspect of the photographs themselves might serve to emphasize unduly the photo of the suspect. The manner in which the photos are presented, grouped, displayed or otherwise exhibited to the eyewitness might be highly suggestive. Finally, the words or actions of the law enforcement official overseeing the viewing might lead or sway an uncertain viewer, thereby compromising the reliability of the resulting identification. *United States v. Ash,* 413 U.S. 300 (1973). Indeed, the court in *Ash* at 332–333, declared that, in a certain sense, particularly in light of the inherent limitation of photographs, "the dangers of misidentification are even greater at a photographic display than at a lineup." This is not to imply that photo identification must provide a pictorial simulation of a lineup. It need not.[3] Neither is there a *per se* rule that police are obliged to conduct a staged lineup in preference to a photographic identification whenever time and circumstances permit.[4]

In the final analysis, despite its hazards, photographic identification is an acceptable and, in certain cases, irreplaceable police investigatory technique. The validity of any photographic identification requires a case-by-case application of the rule to the particular facts of each case and must be determined in light of the totality of the surrounding circumstances. *Holmes v. State, supra,* at 495; *Simmons v. United States, supra,* at 383.

The standard to be applied in measuring the validity of photographic identification procedures is contained in *Simmons v. United States, supra,* 390 U.S. at 384:

[3] *Dozie v. State,* 49 Wis.2d 209, 213, 181 N.W.2d 369 (1970).
[4] *State v. Isham,* 70 Wis.2d 718, 724, 725, 235 N.W.2d 506 (1975).

". . . we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

This court follows the same rule.[5]

The issue for the court in *Simmons,* however, was not the admissibility of allegedly improper pretrial photographic identifications. The results of the viewing of the photographs were not introduced at trial. It was the state's attempt to rely on subsequent in-court identifications by the eyewitnesses which was attacked.

In *Neil v. Biggers,* 409 U.S. 188, 198–99 (1972), the court faced the question not answered by *Simmons* and expanded the *Simmons* rule to cases where the admissibility of the out-of-court identification was at issue:

"It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S., at 384. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process."

The court further held that unnecessary suggestiveness alone does not require the exclusion of the evidence. The overriding question is, 409 U.S. at 199—"whether under

---

[5] *Rozga v. State,* 58 Wis.2d at 441; *State v. Brown,* 50 Wis.2d 565, 185 N.W.2d 323 (1971); *Zdiarstek v. State,* 53 Wis.2d 420, 192 N.W.2d 833 (1972); *Wright v. State,* 46 Wis.2d 75, 175 N.W. 2d 646 (1970); and *State v. Biastock,* 42 Wis.2d 525, 167 N.W.2d 231 (1969).

the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Specific guidelines taken from the cases were provided at 199–200:

"As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[6]

This court has followed the *Biggers* approach. In our opinion in *State v. Isham*, 70 Wis.2d at 726, the language is similar:

"In fact, the issue to be decided is not so much a matter of suggestiveness as it is 'whether, under the totality of the circumstances, the identification was reliable.' " *See also State v. Russell*, 60 Wis.2d 712, 721, 211 N.W.2d 637 (1973).

The test for determining whether an out-of-court photographic identification is admissible or, on review, whether the out-of-court identification was properly admitted has two facets. First, the court must determine whether the identification procedure was impermissibly suggestive. Second, it must decide whether under the totality of the circumstances the out-of-court identification was reliable, despite the suggestiveness of the procedures.

In cases which involve the validity of subsequent in-court identifications the rule is clear: once the defendant shows that the out-of-court identification was improper, the state has the burden of showing that the subsequent

---

[6] *Also see Manson v. Brathwaite*, 432 U.S. 98 (1977).

in-court identification derived from an independent source and was thus free of taint. *Holmes v. State,* 59 Wis.2d at 496; *Fells v. State,* 65 Wis.2d 525, 536, 223 N.W.2d 507 (1974). A similar "burden shift" rule would be appropriate in cases which involve the admissibility of out-of-court identification. Thus once the defendant shows that the photographic identifications were the result of impermissibly suggestive procedures, the state has the burden of showing that the identification was nonetheless reliable under the totality of the circumstances. We now apply the rule to these cases. The defendants base their claim that the photographic identifications were impermissibly suggestive on three factors: three of the photos in the five-photo array were of the three suspects; a photo array was used instead of a lineup; defendant Hickles was the only person pictured with a beard. Additionally, defendants contend that the Investigation photos, all with subjects who fit the same consistencies and contradictions in eyewitness Pinnex' testimony. We conclude none of these objections has any merit.

The array consisted of five black and white Bureau of Investigation photos, all with subjects who fit the same general description. The fact that three of them were police suspects is immaterial. It was not a one-to-one showup as defense alleges. It should be noted however that this court has previously upheld the use of an array with more than one photo of the defendant.[7]

The photo array instead of a lineup has already been discussed. In the cases at hand neither defendant was in custody nor had they been arrested. Further, the witness Pinnex refused to participate in a lineup identification.

There have been cases which have declared that a photographic identification procedure which includes a photo

---

[7] *Holmes v. State,* 59 Wis.2d at 497, and *Mentek v. State,* 71 Wis.2d 799, 803, 238 N.W.2d 752 (1976).

which is unique in a manner directly related to an important identification factor may be held impermissibly suggestive. *Fells v. State,* 65 Wis.2d at 537; *Schaffer v. State,* 75 Wis.2d 673, 250 N.W.2d 326 (1977). *See also, United States v. Sanders,* 479 F.2d 1193, 1197 (D.C. Cir. 1973), where the fact that defendant's photo was the only one in which the subject had facial hair in any way comparable to the initial eyewitness description rendered the procedure impermissibly suggestive. Simple examination of the five photos involved in the array reveals that the present case does not involve such a situation. Hickles' facial hair is not particularly striking or pronounced. Some of the other photos have subjects also with facial hair—mustaches and sideburns. All the photos are similar in aspect. They need not be identical. We stated in *Wright v. State,* 46 Wis.2d 75, 86, 175 N.W.2d 646 (1970):

"The police authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. The police are not required to conduct a search for identical twins in age, height, weight or facial features. If an Eskimo were to be involved in a burglary in Vernon county, it is not to be expected that the sheriff will seek to locate or send to the Arctic for tribesmen who could pass as brothers. What is required is the attempt to conduct a fair lineup, taking all steps reasonable under the 'totality of circumstances' to secure such result."

The defendants argue the discrepancies in Pinnex' testimony render his identification unreliable. They rest their argument here on the conflicting testimony regarding which gunman was carrying which weapon; the initial description which depicted Hickles as the one with the chipped front tooth; and Pinnex' inconsistent testimony, particularly in the Powell case, concerning where Powell stood and what he said during the robbery. How-

ever, claimed discrepancies between the identifications made and the description initially given to the police go to the weight to be given to the identifications by the jury, not to the admissibility of the identification made.

Unreliable evidence, including photographic identification by eyewitnesses, can be attacked by counsel on cross-examination and the closing argument. This was effectively and intensively done in the proceedings of both cases.

■

Because we agree it is clear that the out-of-court photographic identification procedures were not unnecessarily suggestive, it is unnecessary to examine whether it was otherwise reliable under the totality of the circumstances. Likewise, the additional question whether the subsequent in-court identification had an independent basis need not be considered. Nonetheless, we believe Pinnex' photographic identification was a reliable one under the totality of the circumstances. Pinnex was face-to-face with the robbers at close hand for at least six minutes. The tavern was adequately lit. The initial description he gave the police was quite thorough and, in the main, accurate. He was not a mere "casual observer" to the proceedings. He never identified anyone other than the three suspects as being involved in the crime, nor did he fail on any occasion to select Powell or Hickles when asked to identify the robbers.

*By the Court.*—Judgments and orders affirmed.