COURT OF APPEALS
DECISION
DATED AND FILED

December 5, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP2321-CR**

Cir. Ct. No. **2016CF726**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DAMARIO J. GRAHAM,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for La Crosse County: ELLIOTT M. LEVINE, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Damario Graham appeals a judgment of conviction for armed robbery as a party to the crime. He argues that his trial counsel provided ineffective assistance in two respects: (1) mishandling pretrial litigation regarding one witness's out-of-court identifications of photographic images linking Graham to the armed robbery; (2) failing to object to trial testimony by a police officer that, in his experience, some surveillance video images fail to show tattoos that are actually on the hands and forearms of the persons depicted in the surveillance videos. Regarding the identification issue, we assume deficient performance by trial counsel and conclude that Graham fails to show prejudice resulting from the assumed deficient performance. Regarding the clarity of video images issue, we conclude that Graham fails to show deficient performance.

## BACKGROUND

¶2 A criminal complaint charged Graham and Robert Cobb with armed robbery of a La Crosse business, as parties to the crime. The complaint contained the following pertinent allegations.[1] On September 20, 2016, a black male alleged to be Graham entered a title loan business, brandished a handgun, demanded cash, and left with a bag containing cash. Then, a person or persons that allegedly included Cobb drove Graham away in a 2003 Dodge Caravan registered to Amber Nolan.

---

[1] There has been no prosecution to date of the armed robbery charge against Cobb, beyond the filing of the criminal complaint against him, apparently because authorities have been unable to locate him.

¶3 The complaint further alleged that, following the armed robbery, Nolan told police the following. On the night before the armed robbery, three people visited Nolan at her residence: Cobb, who is a white male and the father of Nolan's child; a woman named Trish, who was Cobb's then girlfriend; and a black male, who was a stranger to Nolan. The unknown black male wore "a red outfit from head to toe," and "had tattoos all over[,] including [on] his arms" and on his neck. As Nolan was leaving the house that night, she saw Cobb get into the driver's seat of her van. She also saw the black male in the passenger seat. However, the clean-shaven black male in red was now wearing an obviously fake full beard. We will sometimes refer to the black male who Nolan said visited her apartment as Nolan's "unknown male visitor."

¶4 Further according to the complaint, Nolan also told police that her unknown male visitor appeared to be the same person depicted in the following two images, which police showed Nolan at the time of the interview: (1) an image from a surveillance camera video that had been taken at a La Crosse area Shopko store that depicted the person in the company of Cobb; and (2) a booking photo of Graham. During this interview, police did not present Nolan with any form of photo array; in each case, they just showed her only the single image.

¶5 Graham filed a pretrial motion to prohibit the State from offering the following evidence at trial: (1) Nolan's out-of-court identification of her unknown male visitor as being the same person shown in the surveillance camera image and in Graham's booking photo, and (2) any in-court identification by Nolan that Graham was her unknown male visitor. The basis for Graham's pretrial motion was that the police had obtained Nolan's alleged positive identifications using suggestive identification procedures, which produced unreliable results. *See Powell v. State*, 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978) (if defendant

3

establishes that identification procedure was impermissibly suggestive, then the State can avoid suppression of identification only by showing that procedure was nevertheless reliable under the totality of the circumstances).

¶6   The circuit court held a pre-trial evidentiary hearing on Graham's motion to suppress identification and denied the motion. We provide more details about the hearing in the Discussion section below.

¶7   During the course of a one-day jury trial, the State called one direct witness to the armed robbery, two police investigators, Nolan, and a state-employed DNA expert. Regarding this last evidence, the DNA expert testified that Graham was a source of DNA that was identified on a cigarette butt that police recovered from an ashtray of Nolan's van. The State also offered surveillance images at trial to show that Nolan's van was used in the armed robbery. The defense presented one witness to support an alibi defense, which is summarized in the course of discussion below.

¶8   Testimony elicited by the State at trial included the following. A police detective lieutenant testified that, in his experience, some surveillance videos taken of subjects, especially from a distance, do not clearly show some tattoos, particularly tattoos on the skin of persons with darker complexions. The prosecutor elicited this testimony to provide an explanation for the fact that surveillance video images of the suspect did not clearly show tattoos, despite the fact that Graham, who is African American, had tattoos on his hands and forearms at pertinent times. Trial counsel did not object to this testimony.

¶9   The jury found Graham guilty and he now appeals.

## DISCUSSION

¶10 The following are the pertinent ineffective assistance legal standards:

> "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." The same right is guaranteed under Article I, Section 7 of the Wisconsin Constitution. Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact. The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo. To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial. If the defendant fails to satisfy either prong, we need not consider the other.

> Whether trial counsel performed deficiently is a question of law we review de novo. To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness." In general, there is a strong presumption that trial counsel's conduct "falls within the wide range of reasonable professional assistance."…

> Whether any deficient performance was prejudicial is … a question of law we review de novo. To establish that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*State v. Breitzman*, 2017 WI 100, ¶¶37-39, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted).

¶11 We first address the identification issue, then the clarity of video images issue.

## I.    IDENTIFICATION

¶12    Graham argues that trial counsel was ineffective for failing to investigate and present relevant evidence at the pretrial hearing on his motion to suppress the above-referenced identifications. We now provide additional background to place this argument in context, and then explain our conclusions that Graham fails to develop a supported argument that his defense was prejudiced by trial counsel's performance at the suppression hearing, fails to address other inculpatory evidence presented at trial that was not affected by any ruling at the suppression hearing, and effectively concedes the prejudice issue.

### *Pretrial Hearing*

¶13    At the pretrial hearing, police Det. Lt. Matt Malott testified that, as part of the investigation of the armed robbery, police obtained surveillance video from two sources: (1) the victim title loan business, from the time of the armed robbery; and (2) a La Crosse Shopko store, from shortly before the armed robbery, which the State alleged showed both Cobb and Graham. In addition, La Crosse police obtained a booking photograph of Graham from the Rockford, Illinois Police Department, after Rockford investigators who had viewed the surveillance videos told La Crosse police that they believed the videos depicted Graham.

¶14    Malott further testified at the pretrial hearing that, during the interview with Nolan after the armed robbery, he showed her images from the Shopko surveillance video, but not as part of any photo array. Malott testified that, when shown the Shopko images, Nolan identified Cobb and also said that a black male in one image was her unknown male visitor. Malott further testified that he then showed Nolan the Rockford booking photo of Graham—again, not as

part of any sort of photo array—and she identified Graham as her unknown male visitor.

¶15 The circuit court ruled that the methods police used to obtain these out-of-court identifications were, under the circumstances, impermissibly suggestive. However, the court denied the motion to suppress on the grounds that Nolan had given a "relatively accurate" description of her unknown male visitor and "it is not a questionable identification."

*Trial*

¶16 Called by the State at trial, Nolan testified on direct examination in pertinent part as follows. Cobb, "Trish," and a black male previously unknown to Nolan visited her apartment on September 19, 2016. Cobb told Nolan that she and her children had to move from La Crosse to Rockford that night. As Nolan left her residence that night, Cobb and Nolan's unknown male visitor were both near her van, which was parked on the driveway. All that Nolan recalled noticing about her unknown male visitor was that he was dressed in red and that his eyes were "real white." She never saw her unknown male visitor again. Notably, the State did not ask Nolan to attempt to identify Graham.

¶17 On cross examination, Nolan testified that Cobb had broken her phone during the September 19 visit to her residence. Defense counsel also asked Nolan if she could testify whether the unknown male visitor was in the courtroom and she responded that her memory was not good enough to do so, given the circumstances that night:

> I was pretty shook up that night. All[] I remember is another man [other than Cobb was] there[,] with bright white eyes and a clean cut face. I wasn't really pay[ing] attention, I was so out of it from the argument [that Cobb]

and I had already had …. So, no, I don't remember [the other man's] face at all.

Asked about her interview with police after the armed robbery, in which she was shown the surveillance images and the Graham booking photo, Nolan testified that she was having "a nervous breakdown at that time" and she could not "remember much of that conversation" with police.

*Argument On Appeal*

¶18 With that additional background, we return to Graham's argument that trial counsel provided ineffective assistance of counsel in connection with the pretrial suppression hearing. We will assume without deciding that trial counsel was deficient in failing to take steps that Graham contends would have resulted in his prevailing on all issues at the suppression hearing, and resolve this issue based on Graham's failure to present a supported, developed argument and on his effective concession as to the prejudice issue.

¶19 We first clarify that Graham cannot argue that he was prejudiced by anything his trial counsel did or did not do in connection with the circuit court's denial of his motion to prevent Nolan from making an in-court identification of Graham as her unknown male visitor. This is because at trial Nolan never identified Graham as being her unknown male visitor. To the contrary, her trial testimony was that she had no confidence in her ability to recall much regarding that person, and could not identify the person in court. This leaves the circuit court's decision to permit evidence that Nolan made out-of-court identifications of Nolan's unknown male visitor as being the same person as shown in the Shopko image and as shown in Graham's booking photo. This evidence was admitted at trial through the testimony of Lt. Malott.

¶20     With that clarification, we note that Graham fails to come to grips with the fact that the jury had a chance to directly evaluate Nolan's in-court testimony that, given the circumstances of the visit, she could not identify her unknown male visitor. If credited, this could have significantly undermined any weight that jurors might otherwise have been inclined to place on her out-of-court identifications as testified to by Lt. Malott. In other words, an argument for prejudice arising from Nolan's out-of-court identifications must at a minimum take into account Nolan's in-court testimony that she did not form a strong mental image of the face of her unknown male visitor. It is true that jurors could have found that Nolan's closer-in-time statements were more reliable. But it is also true that Nolan was unambiguous at trial in testifying that she was not able to retain a clear image of the visitor's face. Further, she testified that when she provided the out-of-court identifications to police she was having a "nervous breakdown."

¶21     Bearing those points in mind, we turn to Graham's brief-in-chief. There, on the prejudice topic on this issue, Graham presents only the following as a purported developed argument. If all of Nolan's identification evidence had been suppressed, the State would have been "required" "to seek dismissal of the case,"

> because the only remaining evidence remotely connecting Graham to the La Crosse robbery was the DNA evidence in Nolan's van, detected more than two weeks after the robbery, in Rockford, Illinois, which provided no connection between Graham and La Crosse, Wisconsin, either on the day before or [the] day of the robbery.
>
> Indeed, the defense alibi evidence was not inconsistent with the State's DNA evidence, as the prosecutor argued to the jury. Rather, the alibi and DNA evidence, by themselves, did nothing more than situate Graham in Rockford, Illinois, at some point between the robbery and Graham's arrest.

9

¶22    This reference to the alibi defense calls for additional background. At trial, Graham called Mariah Hallden, his girlfriend, who testified that Graham and Hallden stayed in a hotel in Rockford on September 20, 2016, the day of the robbery, and did not leave that day. Shown a Shopko surveillance image, Hallden testified that the man depicted was not Graham and noted that the person in the image did not have hand tattoos, as Graham does. However, when the prosecutor showed Hallden an image of Graham taken during his interview, Hallden testified that she did not recognize the person in the image.

¶23    Returning to Graham's prejudice argument, as the State explains at some length, Graham inaccurately argues that, aside from the Nolan identification evidence, the only inculpatory evidence consisted entirely of the DNA evidence. Inculpatory evidence included: eyewitness testimony focusing on the unusual appearance of the armed robber's eyes, which links up with Nolan's observations about the eyes of her unknown male visitor; Mallot's own identification of Graham as the robber based on Mallot's comparison of surveillance images to Graham's booking photo; and potentially inculpatory statements that Graham gave to police.

¶24    Graham also inaccurately argues that the DNA evidence did nothing more than place Graham in Rockford, which is where his alibi also placed him at around the same time. The DNA evidence directly linked Graham to the van used in the robbery and to the van's owner, Nolan, who was indisputably linked to Cobb, who was in turn indisputably linked to the armed robbery. Given the surveillance video evidence regarding Cobb, this is a distinctly incriminating link.

¶25    In his reply brief, Graham fails to address these points. This silence effectively concedes that he does not have a supported, developed prejudice

10

argument because he does not address how the absence of Nolan's out-of-court identifications of Graham would have undermined confidence in a trial that featured all of the other evidence described above. Graham fails to carry his burden to show prejudice.

## II.   CLARITY OF VIDEO IMAGES

¶26    Graham argues that trial counsel was ineffective for failing to object to testimony by Lt. Malott that, based on his experience, it is common that some surveillance videos taken of subjects, especially from a distance, do not clearly show some tattoos, particularly tattoos on the skin of persons with darker complexions. Graham argues that if counsel had objected, the circuit court would have ruled that this testimony was not admissible as lay opinion testimony under WIS. STAT. § 907.01 (2017-18), and that it should have been subject to the test for expert testimony under WIS. STAT. § 907.02(1).[2] We agree with the State that the

---

[2] WISCONSIN STAT. § 907.01 addresses "[o]pinion testimony by lay witnesses," and provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are all of the following:
>
> **(1)** Rationally based on the perception of the witness.
>
> **(2)** Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.
>
> **(3)** Not based on scientific, technical, or other specialized knowledge within the scope of a witness under s. 907.02(1).

WISCONSIN STAT. § 907.02(1), which addresses expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

(continued)

11

reasoning in *State v. Small*, 2013 WI App 117, ¶¶13-15, 351 Wis. 2d 46, 839 N.W.2d 160, forecloses this argument and therefore it was not deficient performance for trial counsel not to make this objection.

¶27 We first provide brief additional background. During the course of Lt. Malott's testimony, he identified a still image from a video depicting himself, another officer, and Graham. Looking at this image, Malott testified that he could not see any tattoos on Graham's hands and forearms in the still image, despite the fact that Malott could see tattoos on Graham's hands and forearms when he was in the room sitting directly across from Graham.

¶28 The prosecutor then transitioned to the surveillance video evidence in this case, including the Shopko video, and the apparently undisputed facts that tattoos are not visible on the black male suspect in those videos and that Graham had tattoos on his hands and forearms at the time of the armed robbery. The prosecutor asked Malott if the inability to see tattoos is "common in your experience in surveillance video?" Malott responded yes. The questioning proceeded as follows:

> Q. Why is that?
>
> A. In this case, a couple reasons. One, [Graham] is a black male, the ink is black. The video is pixilated. The video in [the] Shopko camera is quite a distance away from the entrance. This video camera [, which captured the

---

thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

interview images, was] much closer, and I still – you still can't see tattoos. So for all those reasons.

¶29 Regarding this testimony, we first observe that it is hard to know what precise meaning the jury could reasonably have given to the following sentence: "The video is pixilated." Malott was not asked to define or explain "is pixilated," and no other witness talked about the video being pixilated. But in Graham's favor, we will assume that this conveyed a meaning to the jury, namely, that Malott's experience told him that something about the devices used in, or circumstances surrounding, the creation of surveillance videos results in blurring or obscuring effects.

¶30 In addition to this blurring or obscuring concept, Malott explained that, based on his experience: black tattoo ink is less visible on darker complexions than it is on lighter complexions, and the distance between camera and subject is also a factor, so that even with the closer shot from Graham's interview, his tattoos were not visible.

¶31 With that background, we turn to *Small*. The defendant challenged an evidentiary ruling that the lay opinion statute, WIS. STAT. § 907.01, applied to allow testimony from a police officer as to what the officer heard the defendant saying on a surveillance video of a robbery. *Small*, 351 Wis. 2d 46, ¶¶13-14. Small argued that the testimony was not admissible because the officer was not qualified to offer expert testimony regarding his perceptions of what was said. *Id.*, ¶13. We rejected this challenge, explaining that the lay opinion was based only on the witness's perception:

> Absent the use of specialized scientific or technical equipment to analyze the audio, the officer was able to give his lay opinion as to what Small said because expert opinion is not needed if the matter is within the ken of the general population. *See* Gregory P. Joseph & Stephen A.

> Saltzburg, EVIDENCE IN AMERICA, THE FEDERAL RULES IN THE STATES, ch. 50 at 3 (Michie 1987) (The lay witness's opinion is admissible as such if it is based on knowledge that is "common to members of the community.") .... Thus, in *United States v. Begay*, 42 F.3d 486, 502-503 (9th Cir. 1994), … a law-enforcement officer was permitted to give his lay opinion under Rule 701 of the Federal Rules of Evidence as to what a video showed when an enhanced version was played for the jury at a slow speed, when the officer viewed the video more than "100 times" and closely studied some "800 photographs" of incidents recorded by the video, even though he was not at the events recorded or photographed.

*Id.*, ¶15.

¶32      We distinguished between lay opinion admissible under WIS. STAT. § 907.01 and expert opinion admissible under WIS. STAT. § 907.02 as follows. "The jurors here heard the audio as well as the co-owner's testimony of what Small said, and were thus able to use their own life experiences in assessing whether [the lay] opinion was accurate." *Id.*  "This is in contrast to those situations where expert opinion is needed, because in those cases jurors have no independent life experiences on which to rely but must rather referee the battle of experts presented by the parties." *Id.*

¶33      Here, following the logic in *Small* about lay opinion based on ordinary, human perception, Malott's testimony was properly admissible under WIS. STAT. § 907.01.  Malott explained, in a rational albeit brief manner, what his sense of sight had suggested to him in looking at video surveillance images over time.  This could have been helpful to the jury's clear understanding of the "missing tattoos" issue in this case.  And, Malott did not purport to offer scientific, technical, or other specialized knowledge.  While the facts here differ in various ways from the facts in *Small*, its logic applies here.  If the circuit court had been presented with a contemporaneous objection that Malott's testimony was not

14

admissible as lay opinion testimony, the objection should have been denied. As always with evidentiary decisions of this type, the court's decision would have inherently rested in part on Graham's opportunity to cross examine Malott skeptically and vigorously, if he wanted, about any aspect of what Malott testified to about his perceptions of surveillance video images.

¶34 Further, Graham effectively concedes the point by failing to address *Small* in his reply brief, after the State makes extensive reference to it.[3]

## CONCLUSION

¶35 For all of these reasons, we conclude that Graham fails to show ineffective assistance of trial counsel and we affirm the judgment of conviction.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[3] As a final section in his brief-in-chief, Graham challenges various post-conviction findings of the circuit court, but all of the points he makes in this section are either not pertinent, given our conclusions as explained above, or are rejected in the course of discussion above.