COURT OF APPEALS
DECISION
DATED AND FILED

June 2, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1522-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CM310

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

BRANDON B. SMILEY,

  DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Jefferson County: ROBERT F. DEHRING, JR., Judge. *Affirmed*.

¶1    GRAHAM, J.[1] Brandon B. Smiley appeals his judgment of conviction, following a jury trial, for lewd and lascivious behavior and the circuit court's dismissal of his motion for postconviction relief. On appeal, Smiley asserts

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version.

that trial counsel was ineffective for failing to file a motion to suppress evidence of an out-of-court photographic array that police used to confirm Smiley's identity as the perpetrator, as well as any in-court identification by the victim. Smiley argues that the photo array was impermissibly suggestive and that A.B.'s in-court identification was tainted by the suggestive photo array. I conclude that the out-of-court photographic array was not impermissibly suggestive and that counsel was not ineffective for failing to file a suppression motion. Therefore, I affirm.

## BACKGROUND

¶2      Smiley was charged with lewd and lascivious behavior contrary to WIS. STAT. § 944.20(1)(b) based on an incident in which he allegedly exposed his penis to a woman I refer to as A.B.[2]  The following summary of facts is derived from the testimony and exhibits presented at the jury trial and the *Machner* hearing that followed Smiley's postconviction motion and it is consistent with the circuit court's findings of fact.[3]

¶3      On June 22, 2020, at approximately 2:15 p.m., A.B. was shopping at a retail store in Watertown, Wisconsin, and she noticed that someone was standing behind her. She turned around, looked the man in the eyes, and greeted him. She then observed that the man's pants were partially pulled down and that he was masturbating.

---

[2]  We refer to the victim by random initials that do not correspond to her own in order to protect her anonymity.  *See* WIS. STAT. RULE 809.86(4).

[3]  *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case." *State v. Balliette*, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

2

¶4      A.B. told the store clerk what happened and asked the clerk to call the police.  As A.B. waited for an officer to arrive, she observed the man exit the store's front door and walk towards a vehicle in the parking lot, which then drove away.

¶5      When Officer Jonathan Wehner arrived at the store, A.B. provided a written physical description of the man.  A.B. also described the vehicle that he had approached in the parking lot as a bright blue Chevy Malibu or Impala with two very faded red, white, and blue magnetic ribbons on the trunk.

¶6      The week following the incident, Wehner located a vehicle matching the description that A.B. had provided.  He visited the residence of its registered owner, who did not fit A.B.'s description of the perpetrator.  Wehner inquired whether anyone else had access to the vehicle, and the owner indicated that Smiley, who was his daughter's boyfriend, had driven the car the week before.

¶7      Smiley happened to be at the residence at that moment, and Wehner determined that he matched the description that A.B. had provided.  When asked, Smiley denied any knowledge of the incident at the retail store.  Wehner questioned Smiley about his whereabouts at 2:15 p.m. that day, and Smiley indicated that he had been working.

¶8      Wehner investigated Smiley's alibi.  He received Smiley's time-sheet from Smiley's employer, which indicated that Smiley had not clocked in at work until a couple of hours after the incident.  Another officer obtained data from a GPS bracelet that Smiley was wearing on the date in question, and the data indicated that Smiley was at the retail store in Watertown at the time of the incident.

3

¶9      Wehner then assembled a photographic array to test A.B.'s recognition of Smiley as the perpetrator.[4]  The array included six black-and-white photographs:  one headshot of Smiley and five "filler" headshots of other men. Wehner testified that he typically used color photographs in photo arrays, but in this instance, the photograph he had of Smiley depicted him wearing a very bright shirt, which made his photograph stand out from the other five fillers.  Therefore, to prevent Smiley's photograph from standing out, Wehner converted all of the photographs to black-and-white.  Wehner placed the photographs in six different numbered envelopes, with Smiley's photograph in the fourth envelope.  Wehner then gave the array to a second officer, Officer Kathryn Riedl, who had no knowledge of the case, the identity of the suspect, or which envelope contained Smiley's photo.

¶10     Riedl administered the photographic array to A.B. on July 9, 2020.  In accordance with the police department's standard instructions, Riedl showed A.B. each photograph in isolation, asking "Is this the person that you saw?"  If A.B. answered in the affirmative, Riedl would ask "How certain are you?"  Riedl repeated the process with each photograph.  A.B. was permitted to view each photograph more than once, but could not view any of the photographs simultaneously.

¶11     During the photo array procedure, A.B. expressed interest in three of the six photographs—the photograph in the fourth envelope and two of the fillers— and she asked to look at those photographs more than once.  A.B. "kept going back to Envelope 4," and she told Riedl that photograph was "the most of a match as [any] other" to the perpetrator.  A.B. filled out a photo array report form, in which

---

[4] A "photographic array" is a "series of photographs, often police mug shots, shown sequentially to a witness for the purpose of identifying the perpetrator of a crime." *Photo Array*, BLACK'S LAW DICTIONARY (10th ed. 2014).

she indicated that she wished the photographs had been in color and that the individuals were smiling. She confirmed that she had identified three of the photographs as possibly depicting the perpetrator, and that she felt the "most" certain about the photograph in the fourth envelope but "not above 50%." She also wrote, "#4 eyes are lighter – keeps drawing [me] back."

¶12 The State charged Smiley with lewd and lascivious behavior. Smiley pled not guilty and the case proceeded to a one-day jury trial.

¶13 At trial, the central issue was whether it had been Smiley or some other unidentified man who had exposed himself to A.B. There were no video cameras in the retail store on the date in question and, as A.B. acknowledged, she did not actually observe the perpetrator get into the blue Chevy. The State sought to establish that Smiley was the perpetrator through A.B.'s testimony about the man and the vehicle she observed; her testimony that she recalled no other individuals matching the perpetrator's description at the store that day; her out-of-court identification of Smiley's photograph in the photo array; her in-court identification of Smiley at the trial; testimony of the store manager indicating that customers could only exit the store through its front door; testimony of the blue Chevy's registered owner indicating that Smiley had driven the vehicle on the date in question; testimony of law enforcement regarding the investigative efforts described above; and various exhibits including Smiley's time sheet and the GPS data discussed above.

¶14 Regarding A.B.'s out-of-court identification, she specifically testified as follows. On the date of the incident, she had given Officer Wehner the following physical description of the perpetrator: he was young, possibly in his 20s, he was 5'10"-6'0" tall with a thin build; he was African American or possibly "mixed race"

because of his "light skin"; his hair was "curly" and "ethnic" but "not an afro"; and he was wearing a baggy white t-shirt and baggy black pants or jeans. When asked at trial what characteristics stuck out to her about the perpetrator's appearance, she testified that she could "remember his eyes and how far apart they were set, the color of his eyes, … his skin tone, [and] his size."

¶15 Regarding A.B.'s in-court identification, Smiley appeared at the trial via videoconferencing because he had been removed from the courtroom for being "obstreperous and profane," and A.B. identified the individual appearing via videoconferencing as the perpetrator. A.B. estimated that she was 60 to 70 percent certain of this identification, and she testified that she was more certain of her in-court identification of Smiley than she had been of her out-of-court identification in the photo array.

¶16 During closing arguments, Smiley's trial counsel conceded that there "was a lot of evidence" that Smiley was physically present at the store at the time of the incident, and that A.B. had observed Smiley leaving the store and approaching the blue Chevy. However, counsel argued that the evidence was insufficient to prove that it was Smiley, and not some other individual, who exposed himself to A.B. Counsel's theory of the case appeared to be that Smiley and the unidentified perpetrator both happened to be in the store at roughly the same time, and that, because there was nothing about Smiley's appearance that was "unique or different," A.B. mistook Smiley as the perpetrator and provided his description to law enforcement.

¶17 The jury found Smiley guilty. Following his conviction, Smiley filed a postconviction motion alleging ineffective assistance of counsel. He argued that trial counsel should have filed a motion to suppress A.B.'s out-of-court

6

identification on the ground that the photographs selected for the array impermissibly emphasized Smiley's photograph. He claimed that his complexion was "clearly lighter" than that of the men depicted in the five filler photographs, and that the bright hue of his eyes differentiated his photograph from the fillers. Smiley claimed that A.B.'s out-of-court identification was unreliable, and that, if A.B.'s out-of-court identification had been suppressed, any resulting in-court identification would also have been suppressed. He argued that, had the identifications been suppressed, the jury would not have found that he was the perpetrator beyond a reasonable doubt.

¶18 The circuit court held a ***Machner*** hearing at which trial counsel was the sole witness. A photocopy of the six headshots that had comprised the photo array was admitted into evidence, along with the written photo array report form and a police report documenting A.B.'s initial description of the perpetrator.

¶19 Trial counsel testified that he did not file a pretrial motion to suppress the evidence because, in his view, "the photo line-up didn't seem to have any impact on Mr. Smiley being identified as the suspect." That is, Smiley had been identified by other means—the vehicle he was driving and its owner's statement that Smiley had driven it on the day of the incident. Additionally, counsel did not find the out-of-court identification to be especially "material evidence," since A.B. was "not more than 50 percent sure" that the photograph of Smiley depicted the perpetrator. Finally, counsel testified that he did not believe there was a reasonable possibility that a motion to suppress the photo identification would have succeeded.

¶20 The circuit court denied Smiley's motion. The court noted that it had been "unsatisfied" with trial counsel's explanation for not filing the motion, but it determined that counsel "was right not to file a motion to suppress because the

motion wouldn't have been sustained." The court determined that neither the procedures used in conducting the photo array nor the photographs themselves were impermissibly suggestive. Specifically regarding the photographs, the court remarked that, "in looking at the pictures, I wasn't sure which one was Mr. Smiley." The court found that "[e]very one of the photos has a subject with dark hair; all of the hairlines along the top of the forehead are similar; the length of the hair are all similar." As for the complexions of the men in the array, the court found that five of the photographs "have dark and light spots where they're a bit shiny," and that "[t]here's more shininess on Mr. Smiley's picture." However, the court concluded that there was "nothing with these pictures that would suggest 'Hey, pick me.'" Finally, the court found that the photograph of Smiley did not necessarily have the most pronounced eyes, and that another photograph in the array had "similarly vibrant eyes."

¶21 Accordingly, the circuit court concluded that a motion to suppress would have been denied and, therefore, trial counsel's performance had not been deficient. The court also concluded that Smiley was not prejudiced by trial counsel's failure to file the motion because, even assuming it would have succeeded, the State's remaining evidence was strong enough for the jury to find beyond a reasonable doubt that Smiley was the individual who exposed himself to A.B.

## DISCUSSION

¶22 On appeal, Smiley renews his argument that he was denied the effective assistance of counsel when counsel failed to file a motion to suppress the in- and out-of-court identification of him as the perpetrator. *See State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 ("a criminal defendant is guaranteed the right to effective assistance of counsel" (quoting *State v. Lemberger*,

2017 WI 39, ¶16, 374 Wis. 2d 617, 893 N.W.2d 232)). When analyzing a motion to suppress, appellate courts employ a mixed standard of review, upholding the circuit court's findings of fact unless they are clearly erroneous and independently applying constitutional principles to the facts. *State v. Roberson*, 2019 WI 102, ¶66, 389 Wis. 2d 190, 935 N.W.2d 813.

¶23 To demonstrate that counsel's assistance was ineffective, Smiley must establish that counsel's performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Counsel's conduct is constitutionally deficient only if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Whether a defendant was denied effective assistance of counsel presents a mixed question of law and fact." *Breitzman*, 378 Wis. 2d 431, ¶37.

¶24 In determining whether counsel's failure to file the motion to suppress was deficient performance, I consider the merits of the motion that counsel could have filed. *See State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16 ("Counsel does not perform deficiently by failing to bring a meritless motion.").

¶25 A criminal defendant is denied due process when identification evidence admitted at trial stems from a pretrial police procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Under such circumstances, the identification evidence may be excluded.

*Roberson*, 389 Wis. 2d 190, ¶26. A defendant who seeks to exclude identification evidence bears the initial burden of showing that the identification procedure was impermissibly suggestive. *Powell v. State*, 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978). If the defendant fails to meet that burden, the inquiry ends. *Id.* If, on the other hand, the defendant is able to demonstrate that the procedure was impermissibly suggestive, the burden shifts to the State to prove that "the identification is nonetheless reliable under the totality of the circumstances." *Id.*[5]

¶26 As mentioned, the focus of the first step of the analysis is on whether the out-of-court identification procedure was impermissibly suggestive. *State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981). Photo arrays may be suggestive "in several ways—the manner in which the photos are presented or displayed, the words or actions of law enforcement officials overseeing the viewing, or some aspect of the photographs themselves." *Id.* (citing *Powell*, 86 Wis. 2d at 62-63). Smiley does not challenge the manner in which the photographs were presented to A.B., nor does he challenge the words or actions of the officer who administered the array. The sole issue is whether some aspect of the photographs themselves render the array impermissibly suggestive.

¶27 A photographic array is not impermissibly suggestive merely because the individuals in the array differ in appearance. *Mosley*, 102 Wis. 2d at 654; *see also Powell*, 86 Wis. 2d at 67 ("The police are not required to conduct a search for identical twins in age, height, weight or facial features." (citation omitted)). "What is required is the attempt to conduct a fair [identification procedure], taking all steps

---

[5] Additionally, if a subsequent in-court identification is also challenged as tainted by an impermissibly suggestive out-of-court identification, the State must show that the "in-court identification derives from an independent source." *Powell v. State*, 86 Wis. 2d 51, 64-65, 271 N.W.2d 610 (1978); *see also State v. Mosley*, 102 Wis. 2d 634, 652, 307 N.W.2d 200 (1981).

10

reasonable under the totality of circumstances to secure such a result." *Powell*, 86 Wis. 2d at 63 (citation omitted). There is, however, an increased danger of misidentification if the police show the witness an array in which the photograph of the suspect "is in some way emphasized." *Simmons*, 390 U.S. at 383.

¶28 One way in which a photograph may be emphasized is if there are significant differences between the photographs in the array with respect to some characteristic that is "directly related to an important identification factor," meaning a significant feature or description given of the perpetrator. *Powell*, 86 Wis. 2d at 67. A classic example is a witness who describes the perpetrator as having a prominent tattoo, and just one of the photographs in the array—the photograph of the suspect—depicts a person with a tattoo. *See Mosley*, 102 Wis. 2d at 654. Differences in important identification factors may reduce the number of reasonably viable options in the array so as to render it impermissibly suggestive. *Powell*, 86 Wis. 2d at 67. However, the mere presence of a "unique identifying feature" in the defendant's photograph does not by itself satisfy a defendant's burden. *See Mosley*, 102 Wis. 2d at 654. The inquiry requires "a case-by-case application of the rule to the particular facts of each case and must be determined in light of the totality of the surrounding circumstances." *Powell*, 86 Wis. 2d at 63.

¶29 Turning to Smiley's arguments, he contends that the photographic array was impermissibly suggestive because his photograph is the only one that depicts a "light skinned" African American man with "light" or "bright" eyes. According to Smiley, these features rendered his photograph "unique in a manner directly related" to A.B.'s description of the perpetrator as a lighter-complexioned African American man, or a man of "mixed race." I disagree for the following reasons.

¶30    First, as trial counsel emphasized during the trial, A.B.'s description of the perpetrator was fairly generic and did not contain any identifying features that were unique. *Contrast **Mosley***, 102 Wis. 2d at 653-54 (witnesses described the perpetrator as having a tattoo on his arm). A.B. described a tall, lean, light-complexioned African American or multiracial man in his 20s with short curly hair, and all six photographs depict men who fit that general description. Indeed, A.B. herself struggled to identify the perpetrator in the array.

¶31    Second, in addition to matching A.B.'s description, the five filler photographs all feature men who are similar in appearance to Smiley—so much so that the circuit court had difficulty determining which photograph contained Smiley's image.

¶32    Third, I conclude that any variation in the complexions of the men depicted in the array did not render the array impermissibly suggestive. The circuit court implicitly determined that some of the differences in the black-and-white photographs might be attributable to lighting and camera exposure, rather than to differences in complexion. *See **United States v. Bautista***, 23 F.3d 726, 731 (2d Cir. 1994) (concluding that a photographic array in which the defendant's photograph was "slightly brighter" than the five filler photographs was not impermissibly suggestive because those differences "would hardly suggest to an identifying witness that the defendant was more likely the culprit" (citation omitted)). However, even if I were to assume that Smiley's complexion is the lightest of the six men depicted in the array, I would have no reason to believe that A.B. would have been drawn to identify him on that basis. A.B. merely described the perpetrator as having "light skin" for an African American man such that he might be multiracial, and all six photographs fit that general description. A.B. did not

describe the perpetrator's complexion as "very light," nor did she provide any additional details about his skin tone.

¶33 Finally, I conclude that the brightness of Smiley's eyes does not render the array impermissibly suggestive for at least two reasons.

¶34 As a factual matter, the circuit court rejected Smiley's assertion that his photograph "ha[d] more pronounced eyes than the others," and it found that there was a second photo with "similarly vibrant eyes." These findings are not clearly erroneous.

¶35 Even more importantly, A.B. did not mention the perpetrator's eyes at all when she described him to Officer Wehner. Given A.B.'s silence on the appearance of the perpetrator's eyes at the time the array was assembled, Smiley's eyes were not a "unique identifying feature," and Wehner would have had no way of knowing whether Smiley's eyes or the eyes of the men depicted in the filler photographs were more or less consistent with A.B.'s memory of the perpetrator.

¶36 Smiley disagrees with this conclusion. He points to A.B.'s written comment on the photo array report form that "#4 eyes are lighter – keeps drawing [me] back." And he points to A.B.'s trial testimony that she remembered the perpetrator's eyes, how far apart they were set, and their color. It may be that A.B. was drawn to Smiley's photograph because of the appearance of his eyes, but all that would mean is that she recognized the photograph as possibly depicting the person she witnessed committing the crime. It does not mean that the array was impermissibly suggestive. Smiley does not identify any case in which a court has determined that a photographic array was impermissibly suggestive because the witness recognized a trait of the perpetrator when viewing one of the photographs that the witness had not previously described to law enforcement.

¶37 For all of these reasons, I conclude that the photographic array was not impermissibly suggestive and a pretrial motion to suppress evidence regarding the array would not have succeeded. I therefore do not need to address whether A.B.'s out-of-court identification was nonetheless reliable, or whether A.B.'s in-court identification was derived from an independent source.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.