STATE of Wisconsin, Plaintiff-Respondent,

v.

Derrick BENTON, Defendant-Appellant.†

Court of Appeals

*No. 00–1096–CR. Submitted on briefs March 6, 2001.—Decided March 27, 2001.*

## 2001 WI App 81

(Also reported in 625 N.W.2d 923.)

†Petition to review denied.

56

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James E. Kachelski* of *Kachelski, Atta & Straub, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1.　FINE, J.　Derrick Benton appeals from a judgment entered on a jury verdict convicting him of first-degree intentional homicide, *see* WIS. STAT. § 940.01(1)(a), and first-degree reckless injury by the use of a dangerous weapon, *see* WIS. STAT. § 940.23(1) (1997–98).[1] He asserts two claims of alleged trial-court

---

[1] In his notice of appeal, Benton mistakenly refers to the jury verdict as the judgment, and the judgment as an order. He also gives the wrong date for the judgment (referred to by him as an order).

error. First, he contends that the trial court errone-ously permitted a witness, Marcus Murff, to testify that Benton was the person who shot him and killed a man who was a passenger in a car being driven by Murff. Second, he argues that the trial court errone-ously denied his motion to suppress a gun that was linked to the shooting. We affirm.

## I.

¶ 2. Murff testified that he and Mardell Franklin were in a car waiting to enter a car wash when a man approached Franklin, who was sitting in the front pas-senger seat, exchanged words with Franklin, and then started shooting. When Murff, who was behind the wheel, saw that the man had a gun, he tried to drive off but was blocked by other cars. Franklin died from the shots; Murff was seriously injured. Murff told the jury that Benton was the shooter.

¶ 3. The day after Murff was shot, police officers went to his hospital room and showed him an array of six photographs, one of which was a photograph of Ben-ton. He did not identify Benton from the array, and he later testified that he said he did not recognize Benton because he was injured and in pain, that he wanted "to get some rest," that "[p]eople were trying to get in [his] room," and that he "didn't really want to be bothered with the whole thing at the time." At the suppression hearing, however, Murff testified that he did recognize Benton from the array, but did not tell the police that, indicating that "at the time I need[ed] to see it in a line-up because the person was wearing a hat." One year and four months later, the police showed Murff an array of four photographs, and Murff recognized two of the four, one of whom was Benton. Again, however, Murff insisted to the officer that he needed to see a

lineup. Four months later, Murff picked Benton as the shooter out of a five-person lineup. Benton claims that the identification procedure was impermissibly suggestive because he was the only person whose photograph was the same in both arrays. He also claims that the lineup was impermissibly suggestive because he was taller than two of the five persons in the lineup.

¶ 4. About three weeks after the shooting, Benton was a passenger in a car that was stopped by an Illinois law-enforcement officer. The officer testified that the car's registration had expired and was suspended because of a failure to comply with an Illinois law that requires all vehicles registered in that state to have insurance. Once stopped, the car's driver ran towards the officer and told the officer that neither he nor anyone of the three other people in the car owned it. The officer then called for backup support, which arrived. Violation of the Illinois mandatory-insurance law is a misdemeanor. The officer testified that it is his department's normal procedure to do an inventory search of vehicles that are to be towed, as they intended to do to the car. One of the backup officers searched the car and found two loaded guns under the front passenger seat. One of the guns was identified as the source of bullet fragments and casings found in Murff's car and of a casing that was found in Franklin's jacket following his shooting. Benton claims that the search violated his constitutional rights.

## II.

A. *Identification.*

■

¶ 5. "A criminal defendant is denied due process when identification evidence admitted at trial stems

from a pretrial police procedure that is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " *State v. Wolverton*, 193 Wis. 2d 234, 264, 533 N.W.2d 167, 178 (1995) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). In reviewing a trial court's determination whether a pretrial identification should be suppressed, we apply the same rules as the trial court. *State v. Haynes*, 118 Wis. 2d 21, 31 n.5, 345 N.W.2d 892, 898 n.5 (Ct. App. 1984). First, we decide whether the pretrial procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Powell v. State*, 86 Wis. 2d 51, 64, 271 N.W.2d. 610, 616 (1978) (quoted source omitted). The defendant has the initial burden on this issue. *Id.*, 86 Wis. 2d at 65, 271 N.W.2d at 617. If the defendant shows that the procedure was impermissibly suggestive, the State must prove that the identification was reliable under the totality of the circumstances in order for the identification to be admissible. *Haynes*, 118 Wis. 2d at 31, 345 N.W.2d at 897. The trial court's findings of fact, of course, may not be disturbed unless they are "clearly erroneous." WIS. STAT. RULE 805.17(2) (made applicable to criminal proceedings by WIS. STAT. RULE § 972.11(1)). The legal issue of whether the mere fact that a defendant's photograph appeared in two successive photographic arrays taints a subsequent lineup identification is a legal issue that we review *de novo. See State v. Eason*, 2000 WI App 73 ¶ 3, 234 Wis. 2d 396, 399, 610 N.W.2d 208, 210 (application of facts to constitutional principles is subject to *de novo* review).

¶ 6.  As noted, Benton claims Murff's identification of him as the shooter should have been excluded because the same photograph of him was shown to

Murff in the first array the day after the shooting, and the second array, shown to Murff some sixteen months later. He does not contend that the first array was impermissibly suggestive.

¶ 7. The trial court denied Benton's motion to suppress Murff's identification of him, holding that, under the circumstances, neither the second photographic array nor the lineup was impermissibly suggestive. The trial court noted that there was "a great passage of time" between when each of the arrays was shown to Murff, and that, additionally, "the testimony of Mr. Murff shows that he maintained this notion that he really had to see the shooter in a line-up in order to be certain of his identification." Moreover, the trial court examined the pictures and noted that it did not "see anything in these pictures in and of themselves to show that they are, that the array is impermissible suggestive." In addressing Benton's contention that the lineup was impermissibly suggestive, the trial court ruled that the fact that two of the five persons were shorter than the others was not "the kind of difference that makes this line-up put together in an impermissible way."

■

¶ 8.   As the State notes in its appellate brief, Benton is essentially seeking a *per se* rule that when a witness is shown successive photographic arrays that have the same photograph of the defendant in each, any identification of the defendant by that witness in a second or subsequent array or lineup is impermissibly suggestive. A *per se* approach, however, is contrary to the general rule in Wisconsin that whether an identification procedure is impermissibly suggestive must be decided on a case-by-case basis. *See Wolverton*, 193 Wis. 2d at 265, 533 N.W.2d at 178 (declining to hold

that showing witnesses the defendant seated alone in the back of a squad car is *per se* impermissibly suggestive) (invoking prior case law that the practice of showing suspects singly to persons for the purpose of identification, and not part of a lineup, is not *per se* impermissibly suggestive); *State v. Mosley*, 102 Wis. 2d 636, 654, 307 N.W.2d 200, 211 (1981) (declining to hold that "a unique identifying feature *ipso facto* is unduly suggestive").

¶ 9.   Benton bases his argument that using the same photograph of him in both arrays made the identification impermissibly suggestive on *Foster v. California*, 394 U.S. 440 (1969). In *Foster*, the defendant, accused of robbery, was placed in a lineup in which he was one of three men. 394 U.S. at 441. The defendant was "close to six feet in height"; the others "were short—five feet, five or six inches." *Ibid.* The defendant was wearing a leather jacket that the witness who was looking at the lineup said was worn by the robber. *Ibid.* The witness was uncertain that the defendant was the person. *Ibid.* When the witness asked to speak to the person he " 'thought' " was one of the robbers, the defendant and the witness were taken to a room where the only other persons were law-enforcement personnel. *Ibid.* The witness and the defendant sat across a˝ table from one another. *Ibid.* The witness was still uncertain as to whether the defendant was one of the robbers. *Ibid.* A week or ten days later, the witness viewed a lineup with five men; the defendant was the only person who had been in both lineups. *Id.*, 394 U.S. at 441–442. This time, the witness was " 'convinced' " that the defendant was the robber. *Id.*, 394 U.S. at 442. The flaw in this procedure was summarized by *Foster*:

In the first lineup arranged by the police, petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber. When this did not lead to positive identification, the police permitted a one-to-one confrontation between petitioner and the witness. . . . Even after this the witness' identification of petitioner was tentative. So some days later another lineup was arranged. [Foster] was the only person in this lineup who had also participated in the first lineup. This finally produced a definite identification.

The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [Foster] whether or not he was in fact "the man." In effect, the police repeatedly said to the witness, "*This* is the man."

*Id.*, 394 U.S. at 442–443 (internal citations omitted). *Foster* did not, however, lay down a *per se* rule; rather, it noted that under the circumstances of the case, "the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable." *Id.*, 394 U.S. at 443. Indeed, the United States Supreme Court has emphasized that each challenge to a pretrial identification "must be considered on its own facts." *Simmons*, 390 U.S. at 384. The force of this recognition that a *per se* rule is inappropriate can best be gauged by repeating *Simmons's* rationale in full:

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based

on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Ibid.* Thus, relying on *Simmons*, *Kain v. State*, 48 Wis. 2d 212, 219, 179 N.W.2d 777, 782 (1970), held that whether showing a witness one photograph was impermissibly suggestive depended on the circumstances in the case where that procedure was challenged: "A single photo identification is not to be presumed guilty until proved innocent."

¶ 10.   It may very well be that under some circumstances using the same photograph of a defendant in successive arrays will be impermissibly suggestive. But that must be determined on a case-by-case basis and not by implementation of an inflexible *per se* rule. Inasmuch as Benton has not included in the appellate record *any* of the arrays or the photograph of the lineup we are unable to say, on our *de novo* review, that the trial court's cogent analysis is erroneous. *See Duhame v. Duhame*, 154 Wis. 2d 258, 269, 453 N.W.2d 149, 153 (Ct. App. 1989) (when appellate record is incomplete in connection with an issue raised by the appellant, we assume that the missing material supports the trial court's ruling). We are thus also unable to say on our *de*

*novo* review that the trial court's conclusion that the lineup was not, in and of itself, impermissibly suggestive was erroneous. *See ibid.*; *cf. United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) (differences in height do not make a lineup impermissibly suggestive; defendant "shortest by several inches"); *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996) (defendant three to five inches shorter and twenty to forty-five pounds lighter than others in lineup).

B.  *Search of car.*

■

¶ 11.  Although the trial court upheld the search of the car in which Benton was riding as one incident to either an arrest or as an inventory search, we need not reach those issues because, as the State points out, Benton lacked a reasonable expectation of privacy in the area of the car where the guns were found and may thus not challenge the search. *See Rakas v. Illinois*, 439 U.S. 128 (1978).[2] The fundamental principle recognized by *Rakas* is that Fourth Amendment rights against unreasonable searches and seizures are rights personal to those whose Fourth Amendment interests have been invaded:

> Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of. damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment

---

[2] We may, of course, affirm the trial court for any reason. *State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679, 687 (Ct. App. 1985).

> rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Id.*, 439 U.S. at 133–134 (internal citations omitted). Here, as in *Rakas*, Benton "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized," *id.*, 439 U.S. at 148; indeed, all of the car's occupants, including the driver, disclaimed any possessory interest in the car or the guns. Moreover, as in *Rakas*, Benton has not demonstrated that he had "any legitimate expectation of privacy in the . . . area under the seat of the car" in which he was a mere passenger. *Id.*, 439 U.S. at 148–149 ("passenger *qua* passenger simply would not normally have a legitimate expectation of privacy" in that area). Accordingly, Benton lacks standing to contest the search.

*By the Court.*—Judgment affirmed.