COURT OF APPEALS
DECISION
DATED AND FILED

November 23, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP1156-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF321

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

CHARLES GUYTON,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dane County: WILLIAM E. HANRAHAN, Judge. *Affirmed*.

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Charles Guyton appeals a judgment of the Dane County Circuit Court convicting him of second-degree sexual assault and false

imprisonment. Before trial, Guyton moved to suppress evidence of a photographic array that had been presented to the victim for identification purposes on the ground that the array violated his right to due process. The circuit court denied Guyton's suppression motion. Guyton appeals that ruling. We conclude that the photographic array did not violate Guyton's right to due process and, therefore, affirm the circuit court's denial of Guyton's suppression motion.

## BACKGROUND

¶2      The following facts are gleaned from the transcripts of the motion hearing and trial and are not in dispute.

¶3      Officer Butler of the Town of Madison Police Department was dispatched to the residence of R.W. to investigate an alleged sexual assault.[1] R.W. reported the following to Officer Butler. A man approached R.W. while she was walking up to the front door of her apartment. The man persistently asked her to go out with him and requested to be let into her apartment building. After R.W. denied his requests, the man unsuccessfully attempted to grab her keys from her hand. The man then pushed R.W. against a wall and made several sexually suggestive statements to her. The man licked R.W.'s face and neck, touched her breasts and buttocks over her clothing, and pulled down his pants, exposing his penis. After pulling his pants back up, the man then touched his genital area to R.W.'s genital area over R.W.'s clothing. Eventually, the man stepped back, and R.W. was able to escape to her apartment, locking the door behind her before the

---

[1] We refer to the victim as "R.W.," rather than by name, because she was the victim of a crime. *See* WIS. STAT. RULE 809.86(4) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

man could get in. Throughout these events, R.W. did not consent and repeatedly told the man to leave her alone.

¶4 As Officer Butler later testified, R.W. described the assailant as a Black man who was approximately 5'8" to 5'10" and had "short hair or little to no hair" on his head and no facial hair. R.W. also described the man as being "maybe" in his early thirties and described his body type as "maybe a little chubby, but not fat." In his police report, Officer Butler reported R.W.'s description of the assailant's body type as a "thick build." R.W. also recalled that the man identified himself as "Charles" and mentioned that he worked at a nearby Burger King, which she identified.

¶5 Using the information provided by R.W., Officer Butler went to the Burger King and asked the manager if a person named Charles worked there. The manager stated that a man named Charles Guyton worked there and described him as a Black male with a "thicker build" and "shorter hair" on his head. Based on the information provided by the manager, Officer Butler obtained records related to Guyton from a police database.

¶6 Approximately one month after the reported incident, Officer Butler presented R.W. with a photographic array containing photographs of six

individuals.[2]    This array included one headshot of Guyton and five "filler" photographs depicting headshots of other men who appeared to be Black.[3]

¶7    Officer Butler testified that he obtained four of the filler photographs by using an automated computer system employed by law enforcement which selects photographs, for use in arrays, of individuals with physical characteristics similar to those of a described person.    One filler photograph used by Officer Butler was of another individual who lived in the same area as Guyton and has the same first and last name and similar physical characteristics as those of Guyton. Prior to presenting the array to R.W., Officer Butler showed the array to the detective at the Town of Madison Police Department assigned to the case, and the detective approved of the photographs for that purpose.

¶8    Before presenting the array to R.W., Officer Butler read to R.W. standard photographic array instructions, and R.W. signed a form indicating that the instructions had been read to her and she understood those instructions.    After placing each of the six photographs in separate envelopes, Officer Butler shuffled the envelopes with the five filler photographs and placed the envelope with Guyton's photograph so that it was neither the first nor the last in the array.

---

[2] A "photographic array" is a "series of photographs, often police mug shots, shown sequentially to a witness for the purpose of identifying the perpetrator of a crime." *Photo Array*, BLACK'S LAW DICTIONARY (11th ed. 2019).  By contrast, a "lineup" is a "procedure in which physically similar persons, one of whom may be the suspect, stand in a row in front of the victim … or a witness to determine whether the suspect can be identified as the perpetrator of the crime." *Lineup*, BLACK'S LAW DICTIONARY (11th ed. 2019).  A "showup" is a "procedure in which a suspect is shown singly to a witness for identification, rather than as part of a lineup." *Showup*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[3] In briefing in this court, the parties use the common term "filler" photographs to refer to each of the five photographs in the photographic array that did not depict Guyton, and we do the same.

Officer Butler then gave the photographic array to R.W. that included the six envelopes with photographs as well as two envelopes with blank sheets of paper. According to Officer Butler, he included the envelopes with blank sheets at the end of the array with the goal that R.W. would not feel pressured to select the final photograph as showing the assailant. R.W. selected the photograph of Guyton as her assailant and told Officer Butler that she was "95 percent sure that's him." Guyton was charged with one count of second-degree sexual assault and one count of false imprisonment.

¶9 Before trial, Guyton moved to suppress R.W.'s out-of-court identification, arguing that the photographic array denied him his right to due process. The circuit court held a hearing on the first day of trial and denied Guyton's motion. We discuss testimony presented at that hearing and the circuit court's ruling in more detail later in this opinion.

¶10 The case proceeded to trial, and both Officer Butler and R.W. testified as to R.W.'s out-of-court identification. Additionally, R.W. identified Guyton in court as the person who assaulted her and testified that she was "a hundred percent" certain of her in-court identification. The jury found Guyton guilty on both counts. Guyton appeals the judgment of conviction. We mention other material facts in the following discussion.

## DISCUSSION

¶11 On appeal, Guyton argues that the photographic array on which R.W.'s out-of-court identification of Guyton was based violated his right to due process and should have been suppressed. We begin by setting forth governing principles regarding constitutionally based processes for out-of-court identifications and our standard of review.

5

## I. Governing Principles and Standard of Review.

¶12    We apply a two-step analysis in determining whether an out-of-court identification violates due process and must be suppressed. *State v. Roberson*, 2019 WI 102, ¶34, 389 Wis. 2d 190, 935 N.W.2d 813. First, the defendant must meet an initial burden of showing that the identification procedure employed by law enforcement was "impermissibly suggestive such that there was a very substantial likelihood of misidentification." *Id.* "If this burden is not met, no further inquiry is necessary." *State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981). Second, if the defendant proves that the identification procedure was impermissibly suggestive, the State must prove that "the identification was nonetheless reliable under the 'totality of the circumstances.'" *Id.* Also, if a subsequent in-court identification is challenged as tainted by an impermissibly suggestive out-of-court identification, "the state must show the in-court identification derives from an independent basis." *Id.*

¶13    Under the first step of this test, suggestiveness in a photographic array may arise from "the manner in which the photos are presented or displayed, the words or actions of the law enforcement official overseeing the viewing, or some aspect of the photographs themselves." *Id.*[4] With respect to the nature of the photographs, a photographic array may be impermissibly suggestive if it "includes a photo which is unique in a manner directly related to an important identification factor," by which the court meant a significant feature of a

---

[4] In the circuit court proceedings, the parties stipulated that Officer Butler followed the proper "procedure" in creating and presenting the photographic array to R.W. On appeal, Guyton emphasizes that he is challenging only the suggestiveness caused by the nature of the photographs, not the procedure by which Officer Butler created and presented the array to R.W.

description given of the perpetrator. ***Powell v. State***, 86 Wis. 2d 51, 66-67, 271 N.W.2d 610 (1978); *see also* ***Simmons v. United States***, 390 U.S. 377, 383 (1968) (holding that there is an increased danger of "incorrect identification" if the police show the witness "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized"). However, the presence of a "unique identifying feature" in the defendant's photograph does not by itself satisfy a defendant's burden to prove that the photographic array was impermissibly suggestive. ***Mosley***, 102 Wis. 2d at 654. Instead, whether a photographic array was impermissibly suggestive "requires a case-by-case application of the rule to the particular facts of each case and must be determined in light of the totality of the surrounding circumstances." ***Powell***, 86 Wis. 2d at 63.

¶14 When analyzing a motion to suppress, we employ a mixed standard of review. ***Roberson***, 389 Wis. 2d 190, ¶66. First, we review the circuit court's evidentiary findings, which we uphold unless those are clearly erroneous. ***Id.***; WIS. STAT. § 805.17(2) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").[5] A finding of fact is clearly erroneous when "it is against the great weight and clear preponderance of the evidence." ***Phelps v. Physicians Ins. Co. of Wis., Inc.***, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615. Second, we independently apply constitutional principles to the facts, and that presents a question of law. ***Roberson***, 389 Wis. 2d 190, ¶66.

---

[5] WISCONSIN STAT. § 805.17 is made applicable to criminal proceedings through WIS. STAT. § 972.11(1).

7

¶15    The parties dispute how the mixed standard of review for suppression motions applies to the determination of whether a photographic array was impermissibly suggestive.  The State argues that the circuit court's entire ruling is a question of fact subject to the clearly erroneous standard, while Guyton argues that the circuit court's entire ruling is a question of law that we review de novo.  In resolving this dispute, we are mindful that this court is "by the Constitution limited to appellate jurisdiction" and that we are precluded "from making any factual determinations where the evidence is in dispute."  *Wurtz v. Fleischman*, 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155 (1980).  Accordingly, we review the circuit court's determinations about the nature of the photographs in the photographic array—such as the apparent physical characteristics of the depicted individuals and the various particulars of the photographs—as findings of fact subject to the clearly erroneous standard of review.  *See Phelps*, 319 Wis. 2d 1, ¶38 n.10 (Wisconsin appellate courts apply the clearly erroneous standard to a circuit court's findings "even when they are based solely on documentary evidence."); *see also State v. Walli*, 2011 WI App 86, ¶14, 334 Wis. 2d 402, 799 N.W.2d 898 ("The parties disagreed as to what the video in fact showed.  Where the underlying facts are in dispute, the trial court resolves that dispute by exercising its fact-finding function, and its findings are subject to the clearly erroneous standard of review.").  In contrast, the circuit court's ultimate conclusion as to whether the photographic array was impermissibly suggestive is a question of law that we review de novo.  *See State v. Benton*, 2001 WI App 81, ¶¶5, 10, 243 Wis. 2d 54, 625 N.W.2d 923.

¶16    Guyton argues that the photographic array was impermissibly suggestive.  For the following reasons, we reject Guyton's arguments.

8

## II. The Suppression Hearing.

¶17    As noted, the circuit court heard Guyton's suppression motion prior to trial.  At that hearing, Guyton called one witness, Dr. Lawrence T. White, a professor of psychology at Beloit College.  Dr. White testified that, in his opinion, the photographic array was impermissibly suggestive of Guyton's photograph because the physical characteristics of the individuals in four of the five filler photographs did not sufficiently match R.W.'s description of her assailant.  Based on the purported differences in physical characteristics of the individuals in the photographic array, Dr. White testified that only the third photograph—*i.e.*, the photograph of Guyton—and the fifth photograph "fully match the description provided by [R.W.]."  From that, Dr. White concluded that "the functional size, the practical size of the [array] is closer to two than it is to six."  According to Dr. White, the four filler photographs differed from R.W.'s description in one or more of the following ways:  shapes of the heads and faces, framing of the faces in the photographs, attire, ages, and body types.[6]

---

[6] For context, we now briefly summarize aspects of Dr. White's testimony that Guyton does not ask us to rely on, and on which we do not rely.  Dr. White testified that Guyton's photograph did not exactly match R.W.'s description of her assailant because R.W. described the assailant as having no facial hair, while Guyton's photograph showed "some facial hair."  However, as Dr. White conceded at the suppression hearing and, as the circuit court found, "facial hair comes and goes."  Further, the instructions read to R.W. by Officer Butler stated that "appearances can change in terms of hair length and color and also facial hair."  As a result, the parties, Dr. White, and the circuit court did not place any emphasis on hair as shown in the photographs concerning suggestiveness.

Dr. White also testified regarding the following factors that, in his opinion, undermined the accuracy of R.W.'s identification of Guyton in the photographic array.  The thirty-day lapse between the assault and the presentation of the array to R.W. led to a "greater … chance of a mistaken identification."  There is a connection between "stressful, emotionally arousing situation[s]" like the assault that R.W. experienced and "identification accuracy" because "high levels of arousal are associated with more mistakes [in later identification]."  Due to a phenomenon known as "cross-racial identification," people are "generally better at recognizing

(continued)

¶18    At the end of the hearing, the circuit court denied Guyton's suppression motion. The court noted that Dr. White conceded that "his particular area of expertise" did not include determining whether photographs of persons in an array are "significantly alike."[7] According to the court, Dr. White's expertise was related to the accuracy of R.W.'s memory and her description of Guyton, such as the effects of the thirty-day gap, the psychological stressfulness of the assault, and cross-racial identification as discussed in footnote 6, above.

¶19    The circuit court then made factual findings germane to our review. First, with respect to the physical characteristics of the individuals in the photographic array, the circuit court found that all appeared "somewhat similar." Second, the court found that the individuals in the photographs had "largely the same head shapes" and that all six individuals were either clean shaven or had some facial hair. Third, the court found that whether any individual had a "thick build" was a "subjective characterization," which we construe to mean that the

_____

and remembering the faces of people of their own race than they are of different races." According to Dr. White, R.W.'s identification of Guyton was "cross-racial" and was therefore "statistically associated with an elevated risk of making a mistaken identification." The circuit court ruled that these opinions from Dr. White may undermine the weight given by the jury to R.W.'s out-of-court identification of Guyton, but do not affect its admissibility and whether the photographic array violated Guyton's right to due process. Guyton does not argue on appeal that Dr. White's testimony in those respects is pertinent to the determination of whether the photographic array was impermissibly suggestive.

[7] The circuit court stated at the beginning of the suppression hearing that it was considering Dr. White's "testimony as an expert for the purposes of offering opinions" and that Dr. White was "qualified to offer opinions" as an expert. Reasonably construed in the context of the circuit court's rulings as a whole, these statements from the circuit court indicate that the court deemed Dr. White to be qualified to testify as an expert on some subject matters and that the parties would be allowed to ask questions of Dr. White in a form typically used to question an expert. However, the court did not state or imply a ruling that all of Dr. White's testimony comprised expert opinions regardless of the subject or that the court agreed with any of Dr. White's opinions (whether as expert testimony or otherwise).

court did not accept Dr. White's conclusions about the body types of the men in the photographs on the ground that those conclusions were not supported by an explanation from Dr. White regarding any discernible method through which he came to the conclusion about body types. Fourth, the court stated that it was unable to give relevant estimates of the ages of the individuals in the photographs. Fifth, the court found that it could not discern any difference in the height of the individuals because the photographs were headshots. Observing that the individuals selected for a photographic array need not be identical, *see **Powell***, 86 Wis. 2d at 67 ("The police are not required to conduct a search for identical twins in age, height, weight or facial features."), the court concluded that the photographs were not impermissibly suggestive. Accordingly, the court denied the motion to suppress R.W.'s identification of Guyton from the photographic array.

### III. Analysis.

¶20 For the reasons we now discuss, we conclude that Guyton has not satisfied his burden of showing that the individuals shown in the array caused the photographic array to be "impermissibly suggestive such that there was a very substantial likelihood of misidentification." *See **Roberson***, 389 Wis. 2d 190, ¶34. For context, we repeat that R.W. described her assailant as a Black man who was approximately 5'8" to 5'10," was "maybe" in his early thirties, had "short hair or little to no hair" on his head and no facial hair, and had a "build" that was "maybe a little chubby, but not fat."

¶21 First, the circuit court determined that the six photographs in the array were similar in material respects, and this finding is not clearly erroneous. For instance, Guyton does not dispute that all six photographs were headshots of

men who appear to be Black, and that none of the six individuals had a "unique identifying feature," such as a tattoo, scar, or distinctive or substantial facial hair. *See Powell*, 86 Wis. 2d at 67; *Mosley*, 102 Wis. 2d at 654. Further, Guyton does not dispute the circuit court's findings that each of the individuals in the photographs had short or no head hair, little to no facial hair, and that there were no discernible differences in heights of the individuals because the photographs were headshots.

¶22 Second, Guyton asserts in a conclusory fashion that none of the individuals in the filler photos resemble the "shape and contours of [Guyton's] head and face." However, in denying Guyton's suppression motion, the circuit court found that all six individuals had "largely the same head shapes." Guyton does not refute this finding with any citation to the record or legal authority or otherwise demonstrate that this finding is "against the great weight and clear preponderance of the evidence." *See Phelps*, 319 Wis. 2d 1, ¶39. In addition, Guyton does not make a discernible argument about the shapes of the faces as distinct from the shapes of the heads. Accordingly, this finding of fact is not clearly erroneous, and Guyton has not satisfied his burden of proving that the differences in head or face shapes causes the photographic array to be impermissibly suggestive. *See Roberson*, 389 Wis. 2d 190, ¶34.

¶23 Third, the individuals in the first, second, fourth, and sixth photographs were wearing blue shirts, while Guyton and the individual in the fifth photograph were both wearing white shirts. Additionally, Dr. White testified that Guyton's face in his photograph "fills the frame to a larger degree than any of the other faces in the other photographs." The State does not dispute Guyton's assertion that he is only one of two individuals in the photographs not wearing a

blue shirt and that Guyton's face fills the frame of his photograph to a greater degree than the faces of the individuals in the filler photographs.

¶24    According to Guyton, these differences contribute to the impermissible suggestiveness of the array because those make his picture more "distinctive." However, Guyton does not point to any evidence in the record, or otherwise explain, how these differences increased the likelihood that R.W. would choose Guyton over the other individuals. Whereas significant differences in characteristics that are "directly related to an important identification factor" could reduce the number of reasonably viable options in the array, other differences such as the individuals' attire and detail regarding the degree to which his face filled the photo may be less likely to raise that concern. *See Powell*, 86 Wis. 2d at 67; *see also United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) (holding that a photographic array in which the defendant's photograph was "slightly brighter and slightly more close-up" than the five other photographs was not impermissibly suggestive because those differences "would hardly suggest to an identifying witness that [the defendant] was more likely to be the culprit"). For example, while Guyton's face filled the frame to a greater degree than in the other photos, the differences in composition are not significant, and all six photographs clearly revealed the facial features of the subjects. Guyton does not argue that his features are more vivid or detailed in a material way based on his face filling the frame more.

¶25    Fourth, we now consider together ages and body types. With respect to the ages of the individuals in the filler photographs, Dr. White testified that the individual in the first photograph appeared "too young" to be in his early thirties and that the individual in the fourth photograph appeared "younger … than some of the other men." Dr. White also testified that the individual in the second

photograph appeared "too old" to be "someone in their early [thirties]." In Dr. White's view, the photograph of Guyton—*i.e.*, the third photograph—as well as the fifth and sixth photographs, matched the age in R.W.'s description of "maybe" early thirties. Dr. White also testified that Guyton appeared in the photo to be in his "late [thirties] to early [fifties]." Key to our analysis is that Dr. White conceded during his suppression hearing testimony that he is "not an expert in looking at photographs of individuals and then determining their actual chronological age." This concession supports the circuit court's finding, noted above, that Dr. White is not an expert in determining whether persons in photographs are "significantly alike."

¶26 With respect to the body types of the individuals in the filler photographs, Dr. White testified that the individuals in the second and sixth photographs "[did] not have a thick build" and that the individual in the fourth photograph did not "clearly [have] a thick build." According to Dr. White, the photograph of Guyton as well as the first and fifth photographs appeared to portray a man with a "thick build," consistent with R.W.'s description.

¶27 As discussed earlier, the circuit court did not perceive material differences in apparent ages and body types of the individuals in the filler photographs. These are findings of fact to which we defer unless clearly erroneous. *See id.*, ¶66. On appeal, Guyton challenges those findings by relying on Dr. White's testimony that some of the individuals in the array appeared older or younger than being "maybe" in their early thirties or "maybe a little chubby, but not fat." However, Guyton has not provided this court, and did not provide to the circuit court, any basis to determine that Dr. White is qualified as an expert to testify regarding the apparent ages and body types of individuals in a photographic array. *See* WIS. STAT. § 907.02(1) (an expert witness must be qualified by

14

"knowledge, skill, experience, training, or education"). Significantly, Guyton does not refute the circuit court's determination that Dr. White's "particular area of expertise" did not involve determining whether individuals depicted in a photographic array are "significantly alike," and Dr. White conceded his lack of expertise in determining ages of persons shown in photographs. Additionally, Guyton does not identify—and our review of the record does not reveal—any explanation from Dr. White regarding the method by which he determined the apparent ages and body types of the individuals based solely on the headshots in the photographic array. As a result, Guyton has not demonstrated that the court's findings of fact are "against the great weight and clear preponderance of the evidence." *See Phelps*, 319 Wis. 2d 1, ¶39.

¶28 Nonetheless, even if we were to accept Guyton's factual argument regarding the apparent ages and body types of the individuals in the photographic array, Guyton has not satisfied his burden of demonstrating that the array was impermissibly suggestive and there was a "very substantial likelihood of misidentification." *See Roberson*, 389 Wis. 2d 190, ¶34. Case law from our supreme court demonstrates that the alleged differences in apparent ages and body types relied on by Guyton are not impermissibly suggestive. For instance, in *Mosley*, the victims of an armed robbery described the robber as having a tattoo on his arm and were shown a photographic array of five photographs in which the defendant was the only person with a visible tattoo. *Mosley*, 102 Wis. 2d at 653-54. Even though the defendant's photo was "unique in a manner directly related to an important identification factor" (namely, a tattoo described by the victims and a tattoo shown in the defendant's photo), our supreme court stated that the defendant's tattoo was "not particularly striking or pronounced." *Id.* at 654 (quoting *Powell*, 86 Wis. 2d at 67). The court explained that the defendant did not

satisfy his burden to prove that the array was impermissibly suggestive based solely on this tattoo feature. *Id.*

¶29    Here, under the reasoning in *Mosley*, the alleged differences in apparent ages and body types of the individuals in the photographic array are not impermissibly suggestive because those are "not particularly striking or pronounced" and do not combine with other suggestive features. *See id.* Indeed, these differences are even less pronounced than the difference that was not sufficient standing alone to create impermissible suggestiveness in *Mosley* because these differences do not involve the conspicuous presence or absence of a unique identifying feature such as a tattoo. Rather, these involve arguable assessments of apparent ages and body types. Additionally, it is well established that the individuals selected for photographic arrays may have slightly different physical characteristics because "[t]he police are not required to conduct a search for identical twins in age, height, weight or facial features." *See Powell*, 86 Wis. 2d at 67 (quoting *Wright v. State*, 46 Wis. 2d 75, 86, 175 N.W.2d 646 (1970)). Accordingly, Guyton has not met his burden to prove that the alleged differences in apparent ages and body types rendered the photographic array impermissibly suggestive. *See Roberson*, 389 Wis. 2d 190, ¶34.

¶30    Fifth, Guyton contends that the photographic array was impermissibly suggestive, and that Guyton's photo "stand[s] out," because Officer Butler selected filler photos based on Guyton's physical characteristics rather than R.W.'s description of her attacker. According to Guyton, "the research holds that in selecting photos for the fillers, the non-suspect fillers should be chosen to match the eyewitness's general description of the perpetrator's significant features." To support Guyton's assertion about "research" in this field, Guyton relies solely on the "Model Policy and Procedure for Eyewitness Identification" published by the

16

Wisconsin Department of Justice.[8]  Based on those assertions, Guyton repeats his arguments that we have already discussed and rejected about attire, the size of Guyton's face in the photos, ages, and builds.  For at least the following reasons, Guyton's assertion does not cause us to change our previous analysis of those points.

¶31     The initial reason to reject Guyton's argument is that the language in the Model Policy that he asserts mandates that filler photos match the victim's description of the perpetrator is not the constitutional due process standard that guides our analysis.  As noted, the seminal case regarding impermissibly suggestive photo arrays is *Simmons v. United States*, 390 U.S. 377 (1968).  In that opinion, the Court announced the constitutional due process standard of impermissible suggestiveness and approved of the use of photographic arrays for out-of-court identification despite "the hazards of initial identification by photograph." *Id.* at 384.  Of importance here, the Court stated that there is an increased risk of "incorrect identification" if the police show the witness "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." *Id.* at 383.  The Court's

---

[8] The portion of that policy Guyton relies on reads in part:

> Unintentional suggestion can lead an eyewitness to identify a particular individual in a photo array or lineup.  This can occur if one individual stands out from the others due to the composition of the array or lineup…. [S]uggestion can occur if the suspect is the only person in the array or lineup who resembles the witness's description of the perpetrator.  Therefore, non-suspect fillers should generally be chosen to match the witness's description of the perpetrator.

WISCONSIN DEP'T OF JUSTICE, MODEL POLICY AND PROCEDURE FOR EYEWITNESS IDENTIFICATION 3,   https://www.doj.state.wi.us/sites/default/files/2009-news/eyewitness-public-20091105.pdf.

recognition of the "hazard" of an individual's photograph being "in some way emphasized" reasonably leads to the conclusion that impermissible suggestiveness can be measured in multiple ways, including by comparing the filler photos to the witness's description and also by comparing the filler photos to the suspect's photograph.

¶32    In *Powell*, our supreme court stated that impermissible suggestiveness may occur if "[s]ome aspect of the photographs themselves … serve[s] to emphasize unduly the photo of the suspect" or if the array includes a "photo which is unique in a manner directly related to an important identification factor." *Powell*, 86 Wis. 2d at 63, 66-67.  That standard from our supreme court takes into account potentially problematic differences between the filler photos and the witness's description of the perpetrator as well as differences between the characteristics of the filler photos and the suspect's photo.

¶33    As a result, Guyton's contention that, as matter of due process, the filler photos must match the description of her assailant given by R.W. is not correct and is not supported by any authorities.  Rather, as we have explained, the constitutional standard by which photo arrays are measured directs that arrays must be analyzed to determine whether the array impermissibly steered the witness to the suspect's photo, using standards that include comparison of filler photos to R.W.'s description and to Guyton's photo.

¶34    Moreover, as Guyton concedes, the methodology he relies on is not required under the Model Policy, but is merely recommended as a "best practice[]."  The Model Policy states in pertinent part:

> When there is an inadequate description of the perpetrator, or when there is a suspect whose appearance

differs from the description of the perpetrator, fillers should resemble the suspect in significant features.

WISCONSIN DEP'T OF JUSTICE, MODEL POLICY AND PROCEDURE FOR EYEWITNESS IDENTIFICATION 8-9, https://www.doj.state.wi.us/sites/default/files/2009-news/eyewitness-public-20091105.pdf. Accordingly, to the extent that R.W.'s description of her assailant (which, as noted, included two physical characteristics qualified by R.W. with the term "maybe") was not detailed, the Model Policy on which Guyton relies suggests that the filler photos should generally resemble Guyton's physical characteristics as shown in his photo.[9]

¶35 In sum, Guyton has not satisfied his burden of proving that the array was "impermissibly suggestive such that there was a very substantial likelihood of misidentification." *See Roberson*, 389 Wis. 2d 190, ¶34.[10]

---

[9] Further, Guyton's argument is undercut because Guyton's contentions on appeal do not consistently focus on R.W.'s description of her assailant. As examples, Guyton argues that the individuals' attire, the size of Guyton's face in a photo, and the shape of the individuals' heads and faces in the array also contribute to impermissible suggestiveness, even though those factors are not related to R.W.'s description.

[10] Because we conclude that the photographic array was not impermissibly suggestive, we need not address Guyton's arguments that R.W.'s identification was not reliable and that R.W.'s in-court identification was tainted by the out-of-court identification. *See State v. Mosley*, 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981) (If the defendant does not satisfy the burden of showing that the identification procedure employed by law enforcement was impermissibly suggestive, then "no further inquiry is necessary."). We also do not address the State's alternative argument that denial of the motion to suppress the photographic array, if error, was harmless error. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

## CONCLUSION

¶36 For the foregoing reasons, the judgment of the circuit court is affirmed.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.