COURT OF APPEALS
DECISION
DATED AND FILED

September 12, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP476-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2014CF1714

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

       PLAINTIFF-RESPONDENT,

  V.

JOSE M. DANCEL,

       DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: FREDERICK C. ROSA and DAVID A. FEISS, Judges. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Jose M. Dancel appeals the judgment convicting him of the following crimes:  (1) attempted first-degree intentional homicide with use of a dangerous weapon; (2) first-degree reckless injury with use of a dangerous weapon; (3) endangering safety by reckless use of a firearm; and (4) felony bail jumping.  He also appeals the order denying his postconviction motion.[1]  The sole issue on appeal is whether the lineup procedure in this case was impermissibly suggestive.  We conclude that it was not and affirm.

## I. BACKGROUND

¶2    The State filed a criminal complaint charging Dancel with attempted first-degree intentional homicide while armed with a dangerous weapon and felony bail jumping.  The complaint alleged that on March 22, 2014, Amy[2] was transported to a hospital after suffering twenty-seven gunshot wounds.  Amy survived and later told police that she was sitting in her car outside of the salon where she worked when a Hispanic male, whom she later identified as Dancel, approached her and fired gunshots at her.  Amy told the police that when she initially turned into the alley near the salon, she saw Dancel driving a silver truck.

¶3    The complaint relayed that another witness, Alex, told police that she saw a silver truck with a butterfly sticker drive past her home the morning of

---

[1] The Honorable Frederick C. Rosa presided over Dancel's trial and sentenced him.  The Honorable David A. Feiss issued an order granting in part and denying in part Dancel's postconviction motion.  While the notice of appeal indicates that Dancel is appealing the order denying his postconviction motion, Dancel advises in his appellate brief that the issues raised in his postconviction motion are not at issue on appeal.

[2] To preserve privacy, the parties refer to the victim as "Amy."  They refer to the witness who reported seeing a silver truck with a butterfly sticker the morning of the shooting as "Alex" and to Alex's daughter as "Catherine."  We will do the same.

the shooting. Soon after, she saw a man, whom she later identified as Dancel, walk through the alley. Alex then heard gunshots and saw the same man walk back around a garage carrying a black semi-automatic handgun.

¶4 The State subsequently amended the information to include additional charges for first-degree reckless injury with use of a dangerous weapon and endangering safety by use of a dangerous weapon.

¶5 Dancel filed a motion to suppress the identification made during the lineup and any subsequent in-court identifications based on the lineup. He challenged the lineup procedure on grounds that the fillers did not match the witnesses' descriptions of the shooter and because he stood out because he is Asian. Dancel additionally alleged that the police steered Amy into identifying him as the shooter. Specifically, Dancel asserted that Amy did not identify him as the shooter until Detective Raena Vrtochnick[3] conducted a post-lineup interview with her.

¶6 The court held an evidentiary hearing during which Detective Jason Enk, Detective Edward Chaim, and Detective Vrtochnick testified. Detective Enk testified that he selected five individuals for the lineup who closely matched Dancel's physical and facial descriptions.

¶7 Detective Chaim testified his role in the lineup procedure was to read instructions to the people who were viewing it. Afterward, Detective Chaim interviewed Alex in Spanish. Detective Chaim explained that Alex only spoke Spanish and he was the only Spanish-speaking detective who was present.

---

[3] At the time he filed his motion, the detective had a different last name.

3

Detective Chaim noticed that Alex had identified Dancel following the lineup. When he asked her about the identification, Detective Chaim testified:

> [S]he identified him based on his facial features, his build, and his hair. And she said that when she witnessed … the part of the incident that she witnessed, she was able to see both sides of the suspect's face, and that when she saw him go into the room [where the lineup was held] that she immediately felt nervous and anxious, and that's how she identifies him.

¶8 Detective Vrtochnick testified that she conducted a post-lineup interview of Amy. Detective Vrtochnick said that only she and Amy were present for the post-lineup interview and that Amy had circled "no" for all of the individuals in the lineup except for the individual in position 4. When Detective Vrtochnick asked Amy why she had not circled "yes" or "no" for that individual, Amy responded by saying she "was positive that the person who was in position 4 of the lineup was the person who had shot her, but that the person in position 4 had slightly shorter hair than the person who shot her." At that point, Detective Vrtochnick reiterated to Amy the information on the lineup identification form that she should "keep in mind that things such as hairstyles can easily be changed." According to Detective Vrtochnick, after she and Amy had that interaction, Amy circled "yes" for the person in position 4 and indicated she was "positive without doubt."

¶9 After listening to the arguments and reviewing the video of the lineup, the circuit court found that nothing was done "to highlight or emphasize the defendant. The one thing I was concerned about was his ethnicity and his features, but there's—there's some individuals in the lineup that have similar features." The circuit court concluded that the lineup was not impermissibly suggestive.

4

¶10     The matter proceeded to trial, and the jury found Dancel guilty of all four charges. This appeal follows.

## II. Discussion

¶11     On appeal, Dancel argues that the circuit court erred in denying his pretrial suppression motion. A defendant's due process rights are violated if identification evidence is admitted that stems from a police procedure that is "impermissibly suggestive." *State v. Benton*, 2001 WI App 81, ¶5, 243 Wis. 2d 54, 625 N.W.2d 923 (citation omitted). A challenge of identification evidence consists of two prongs. First, the defendant must show that the procedure used in the identification was impermissibly suggestive. *Powell v. State*, 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978). This burden is met if it is shown that the procedure used would "give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 64 (citation omitted). If the defendant successfully establishes impermissible suggestiveness, the burden then shifts to the State to establish the second prong: that "the identification was nonetheless reliable under the totality of the circumstances." *Id.* at 66.

¶12     In reviewing a circuit court's decision on a motion to suppress, we apply a two-step standard of review. *See State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. We first review the circuit court's findings of fact, and will uphold them unless they are clearly erroneous. *Id.* We then "review the application of constitutional principles to those facts *de novo*." *Id.*

¶13     Dancel contends that the lineup in this case was impermissibly suggestive because he had a unique identification factor that the fillers lacked, i.e., he was "the only person of Asian descent in the lineup" while the fillers, the trial court found, "[a] lot of them seem[ed] to have Hispanic features." Dancel also

argues that he had "noticeably darker" skin and "markedly different facial hair" than the fillers. In addition, Dancel claims the lineup procedure was "compromised" when Detective Vrtochnick conducted a post-lineup interview with Amy.

¶14 We note at the outset that Dancel points out that the lineup procedure deviated from the best practices recommended by the Wisconsin Department of Justice (DOJ) "Model Policy and Procedure for Eyewitness Identification" in several ways. Dancel does not demonstrate that the model policy has the force of law.[4] We, therefore, reject as conclusory any suggestion that the model policy somehow controls the outcome here. *See Gaethke v. Pozder*, 2017 WI App 38, ¶31, 376 Wis. 2d 448, 899 N.W.2d 381.

¶15 We turn to Dancel's claim that because he is Asian, the lineup was improperly suggestive. In so arguing, he glosses over the fact that his race was not important to the identifications made by the witnesses who testified at trial: Amy; Alex; and Alex's daughter, Catherine. Identifications that include a unique characteristic that is "directly related to an important identification factor may be held impermissibly suggestive." *Powell*, 86 Wis. 2d at 66-67. Conversely, characteristics that are not directly related to an important identification factor are not necessarily impermissibly suggestive. *See State v. Mosely*, 102 Wis. 2d 636, 654, 307 N.W.2d 200 (1981) ("[W]e decline to assume that a unique identifying feature *ipso facto* is unduly suggestive, without more persuasive proof by the defendant, under his assigned burden, that such was the case in fact.").

---

[4] We observe that the introduction to the model policy states: "These recommendations are not intended to create, do not create, and may not be relied on to create, any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."

¶16    Here, all three witnesses testified that they identified Dancel as the shooter before they realized that he was Asian. Alex—the witness who saw Dancel walk through the alley near her home, heard gunshots, and then saw him walk back around a garage carrying a black semi-automatic handgun—testified that when she first saw Dancel in the lineup, i.e., while he was wearing sunglasses, she was "certain" that he was the shooter. But when Dancel removed his sunglasses during the lineup, she was "surprised" that he was Asian and not Hispanic.

¶17    Catherine, Alex's daughter, testified at trial that while she was with her mom in their home on the morning of the shooting, she saw Dancel park his truck and walk toward the back of the salon. Shortly thereafter, Catherine testified that she heard gunshots. She then saw Dancel walk back and put a gun inside his pants. Catherine recalled seeing Dancel outside her home in a silver truck prior to the shooting and at one point, had come face-to-face with him. She explained that she originally thought Dancel "was Latino because of his skin color."[5] She also testified that, on the two occasions that she had seen Dancel prior to the lineup, he was wearing sunglasses so she could not see his eyes.

¶18    During the lineup, Catherine recognized Dancel as the shooter "right away," i.e., while he was still wearing the sunglasses. It was only when Dancel removed his sunglasses at the end of the lineup that she "noticed [Dancel] had Asian eyes." But Catherine added that seeing Dancel's eyes "didn't change [her] mind" about Dancel being the shooter. We agree with the State's assessment that

---

[5] At trial, Catherine testified that she identified Dancel as Hispanic during her 911 call.

7

Catherine identified Dancel as the shooter *despite* him being Asian, not because of it.

¶19    Amy acknowledged that she initially described Dancel as being a Hispanic male. However, at some point, she realized that Dancel may be "Filipino." Although Amy could not recall exactly when she came to that realization, her identification of Dancel as the shooter did not change. We conclude that because Dancel's race was not an important identification factor, his argument that the lineup was impermissibly suggestive because he is Asian fails.

¶20    Dancel's argument that the lineup was impermissibly suggestive due to his "noticeably darker" skin tone and "markedly different facial hair" also fails. Alex testified that she recognized Dancel as the shooter based on his "side facial features," the "shape of his nose," his "body build," and his "hair." During trial, Amy explained that when she saw Dancel during the lineup, she "knew immediately it was him[.]" She testified that she identified Dancel based on his "build, the shoulders, the body," as well as "the way he stood, the way his face looked with the [sun]glasses, [and] his demeanor[.]" Meanwhile, Catherine testified that she "recognized [Dancel] right away by the side of his face." Dancel's skin tone and his facial hair were not important factors in the identifications made by Amy, Alex, and Catherine.

¶21    Moreover, the circuit court expressly found that all six participants' "skin tone looks similar." The circuit court also found that although the fillers would not be confused for Dancel's twin, several had "similar features" that made them look "reasonably close" to Dancel. *See **Wright v. State***, 46 Wis. 2d 75, 86, 175 N.W.2d 646 (1970) ("The police are not required to conduct a search for identical twins in age, height, weight or facial features.").

8

¶22 Next, we turn to Dancel's argument that the procedure used by police compromised Amy's lineup identification. He contends that "the lineup was infected by Detective Vrtochnick's simultaneous participation in the post-lineup interview" because she knew that Dancel was "an Asian male." Detective Vrtochnick testified that she obtained information that Dancel was Asian male of Filipino descent from an unknown third party, possibly from the "observation of [another] officer." Detective Vrtochnick also testified that she did not remember seeing Dancel prior to the lineup and that she did not recognize any of the lineup participants when it was taking place.

¶23 During her testimony, Amy made clear that Detective Vrtochnick had no impact on her identification of Dancel as the person who shot her. Specifically, Amy testified that, when she saw Dancel enter the viewing room, she "knew immediately" that he was the person who shot her. She acknowledged that she did not immediately circle either "yes" or "no" for Dancel because his hair was "slightly shorter" than before. Amy testified, Detective Vrtochnick reminded her of the lineup instructions she had previously been given, and then told Amy to "follow what felt right." Amy's testimony reflects that she was positive that Dancel was the shooter before speaking with Detective Vrtochnick.

¶24 Because the lineup was not impermissibly suggestive, we need not analyze whether the identifications were nonetheless reliable. *See Mosley*, 102 Wis. 2d at 652 (stating that if the defendant does not satisfy the burden of showing that the identification procedure employed by law enforcement was impermissibly suggestive, then "no further inquiry is necessary."). We also do not address the State's alternative argument that denial of the motion to suppress the photographic array, if error, was harmless error. *See Barrows v. American Fam. Ins. Co.*, 2014

9

WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.